**COMMONWEALTH EDISON COMPANY et al., Plaintiffs,**

v.

**ALLIS-CHALMERS MANUFACTURING COMPANY et al., Defendants.**

No. 61 C 1278 and related power switch-gear assembly cases in this District bearing Nos. 61 C 1689, 61 C 2180, 62 C 23, 65 C 170, 65 C 449–65 C 451, 65 C 544, 65 C 864, 65 C 865, 65 C 900, 65 C 920, 65 C 1000–1015 and 65 C 1129.

United States District Court
N. D. Illinois, E. D.
July 19, 1965.

and Raymond W. Midgett, Jr., Dechert, Price & Rhoads, Philadelphia, Pa., for defendant I–T–E Circuit Breaker Co., Philadelphia, Pa.

ROBSON, District Judge.

The above captioned actions are part of the more than nineteen hundred related treble damage antitrust actions involving the electrical equipment industry which were filed throughout the country during the early 1960's.[1] Plaintiffs in the instant cases are seeking damages for alleged overcharges on their purchases of power switchgear assemblies.

Seventeen of the twenty-one power switchgear assembly actions originally brought in this District have been dismissed. Twenty-seven additional power switchgear assembly cases have been transferred here from six other districts, one of which has been dismissed, leaving thirty suits pending. All of these actions have been consolidated for pre-trial purposes, and this Court has set one or more of them for trial on October 4, 1965.

Plaintiffs have moved pursuant to Rules 11 and 12(f), F.R.Civ.P., to strike defendant I–T–E Circuit Breaker Company's defense of economic coercion.[2] Extensive pre-trial discovery has been completed and the cases are now entering the final pre-trial stages. Efficient handling of this complex litigation requires that the real issues in dispute be sharply delineated, and the immaterial issues eliminated. Though motions to strike are not favored by the federal courts,[3] they provide a useful and appropriate tool where the parties disagree only on the legal implications to be drawn from uncontroverted facts, or where questions of law are involved. To this end the

Charles Bane, Isham, Lincoln & Beale, Chicago, Ill., for plaintiff Commonwealth Edison Co., Chicago, Ill.

Robert Sher, Sher & Harris, Washington, D. C., for plaintiff Porto Rico Water Resources Authority, Piqua, Ohio.

Harold E. Kohn, Dilworth, Paxson, Kalish, Kohn & Dilks, Philadelphia, for plaintiff City of Philadelphia et al.

Elroy C. Sandquist, Jr., Peterson, Lowry, Rall, Barber & Ross, Chicago, Ill.,

1. The general background of this litigation and the procedures developed to cope with it are described in Neal and Goldberg, The Electrical Equipment Antitrust Cases: Novel Judicial Administration, 50 A.B.A.J. 621 (July 1964).

2. Plaintiffs originally moved to strike this and other defenses in four actions (Nos. 61 C 1278, 61 C 1689, 61 C 2180 and 62 C 23). By stipulation the aspects of the motions dealing with other defenses were withdrawn, without prejudice to future reinstatement, and the motions and this memorandum and order have been made applicable to all 30 cases.

3. Lehman Trading Corp. et al. v. J & H Stolow, Inc., et al., 184 F.Supp. 21 (S.D N.Y.1960).

Court on March 2, 1965 entered Local Pre-Trial Order No. 4 which required I–T–E to file "a detailed written statement stating in separately numbered paragraphs all facts and contentions which relate to or bear on your defenses of 'coercion, duress and compulsion * * *' and your inability to refrain from participating in the alleged conspiracy in this product line, or any attempts made by you to withdraw from the conspiracy in this product line."[4]

■■ The Court has concluded that plaintiffs' motions so strike should be granted for three reasons. First, economic coercion is not a legal defense to treble damage actions. Second, I–T–E has failed to assert facts sufficient to meet the legal criteria of economic coercion as developed through judicial decision. Third, this sanction should be imposed on I–T–E for failure to comply with Local Pre-Trial Order No. 4 and subsequent directions of the Court.

I. *Legal Sufficiency of the Economic Coercion Defense in Treble Damage Actions.*

■ I–T–E's coercion defense attacks the heart of plaintiffs' causes of action. For plaintiffs to recover from I–T–E in these cases they must first prove that I–T–E has violated the antitrust laws. The theory of the coercion defense is that a party who is forced to participate in an illegal conspiracy has not violated the antitrust laws. I–T–E alleges that its participation in the conspiracy resulted from economic coercion by the larger electrical equipment manufacturers, "(General Electric, Westinghouse and, from time to time, Allis-Chalmers)",[5] and accordingly, that it has not

committed the tort necessary to create liability to plaintiffs.

This result would overlook the significance of the following discussion in United States v. Paramount Pictures, Inc., et al., 334 U.S. 131, 161, 68 S.Ct. 915, 931, 92 L.Ed. 1260 (1948) (an equitable proceeding):

"There is some suggestion on this as well as on other phases of the cases that large exhibitors with whom defendants dealt fathered the illegal practices and forced them onto the defendants. But as the District Court observed, that circumstance if true does not help the defendants. *For acquiescence in an illegal scheme is as much a violation of the Sherman Act as the creation and promotion of one.*" (Emphasis supplied.)

Although it may be arguable that the economic coercion defense is less applicable in an equitable suit for remedial relief than in a punitive criminal or treble damage action, this Court has concluded that Paramount is binding precedent and, accordingly, that plaintiffs' motions to strike should be granted.[6] I–T–E attempts to distinguish the word "acquiescence", used in Paramount, from the "coercion, duress, and compulsion" inflicted upon it. The defense asserted in Paramount was that "illegal practices" were "forced" upon certain of the defendants. Similarly, here it is asserted that I–T–E has been coerced into various actions. The attempt to distinguish between "forced acquiescence" and "coercion" is pure semantics.

The defense of economic coercion has not barred recovery by treble damage

4. A copy of Local Pre-Trial Order No. 4 is attached hereto as Appendix A.

5. Answers of Defendant I–T–E Circuit Breaker Company to Plaintiffs' Complaint in Commonwealth Edison Company et al. v. Allis-Chalmers Manufacturing Company et al., C.A. No. 61 C 1278 and related cases, at 3.

6. In Paramount, the district court's rejection of the defense was specifically

questioned by defendant Universal Pictures Company, Inc. To hold this defendant liable for discriminating against the small independent exhibitors the Supreme Court had to pass on the merits of the defense. See, Brief for Universal Pictures Company, Inc., et al., Appellants, at 35.

plaintiffs in any case reported to date. The Ninth Circuit commented on the defense in two treble damage actions. The first of these, Flintkote Co. v. Lysfjord et al., 246 F.2d 368, 375 (C.A.9 1957), was a suit by an acoustical tile contractor against a tile supplier (Flintkote), a contractor's trade association and certain of its members. The complaint charged a conspiracy to monopolize the acoustical tile industry and a threat by the Association and its members to boycott Flintkote's products unless it discontinued supplying plaintiff. Holding that there was sufficient evidence to support the jury's findings of Flintkote's participation in the conspiracy, the Ninth Circuit relied on Paramount and stated:

" * * * There was no direct evidence that Flintkote, as a seller of tile and not an installer, participated directly in that original conspiracy between the dealers, but there was evidence from which an inference might have been drawn by the trier of fact warranting the belief that the defendant Flintkote, through acting as supplier to the conspirators on some of the jobs, could have acquired knowledge of the conspiracy; and there was evidence which warranted the conclusion that Flintkote, with such inferred knowledge, participated in the conspiracy, and aided it, by its refusal to sell to plaintiffs. If that refusal was not the result of the exercise of ordinary business judgment, but the result of threats made and pressure applied by members of the known conspiracy to and against Flintkote, the act of refusing to sell would constitute knowing participation. Because one is coerced by economic threats to participate in or aid and abet an illegal scheme does not excuse the actor."

The Ninth Circuit made no reference to Paramount in Fox West Coast Theatres Corp. et al. v. Paradise Theatre Building Corporation, 264 F.2d 602, 605 (C.A.9 1958) (treble damage suit against six motion picture producers-distributors-exhibitors) which expressed the opposite view:

" * * * Once it is found that there was substantial evidence that these three organizations combined unlawfully to discriminate against Paradise, then evidence of action by others tending to produce the unlawful result may be corroborative of the charge, even though these others may not be found eventually to have been conspirators. The jury may clear some participants in parallel action for lack of knowledge of the scheme or unlawful design or because they were coerced. Thus, although each may have been a participant in acts which tended to effectuate the result complained of, the jury may have found them innocent tools of the conspirators whom the jury found unlawfully formulated, carried on and did overt acts charged to bring about the isolation of Paradise. The jury had a right and the duty to consider the record as a whole and determine who, if any, were participants in an unlawful combination."

The court's discussion in both cases is *dictum*. In Flintkote, supra, coercion was not advanced as a defense but was introduced by plaintiff to prove defendant's knowledge of and knowing participation in the conspiracy. In Fox West Coast Theatres, supra, the Ninth Circuit considered the sufficiency of the evidence (i. e., inferences to be drawn from parallel behavior) to sustain the verdict finding only three of six defendants liable. The court's language in the latter case means only that where proof of conspiracy is circumstantial, it is for the jury to decide whether a particular act resulted from participation in the conspiracy, or from coercion which made the defendants

the "innocent tools of the conspirators. * * *" [7]

## II. I-T-E Has Failed to Assert Facts Sufficient to Meet the Legal Criteria of Economic Coercion.

■■ Because of the absence of authority directly on point this Court chose not to rule on the sufficiency of the economic coercion defense in a factual vacuum. The factual background was to be provided by the responses ordered to Local Pre-Trial Order No. 4. I-T-E's response was intended to serve as an offer of proof for all the facts and contentions in support of this defense.[8] Its response does not assert facts sufficient to meet the basic criteria of coercion as established by judicial decisions. These criteria include: (1) the coerced party was deprived of its free will; (2) it had no available alternative course of action; (3) the threatened consequences were such that the remedy at law was insufficient; (4) the threatened acts were illegal; and (5) the coercion was exercised by the party against whom the defense is asserted. (6) In addition, the party asserting the defense must have promptly disavowed the involuntary acts or acquiescence will be implied as a matter of law.

(1) I-T-E has failed to show any instances where it was deprived of free will.

■ Coercion principles which have long been applied in the criminal law have been extended to other branches of the law by modern decisions. Business compulsion is now recognized as a species of duress.[9] There is no litmus paper test indicating when such coercion occurs. Rather, the coercive acts must be examined to determine their effect on the complaining party. Duress is present only when the individual is deprived of his free will and judgment. As stated in Winget v. Rockwood et al., 69 F.2d 326, 330 (C.A.8 1934) (suit to rescind a contract for the sale of stock):

"* * * There is no legal standard of resistance with which the victim must comply at the peril of being remediless for a wrong done, and no general rule as to the sufficiency of facts to produce duress. * * * In other words, duress is not to be tested by the character of the threats, but rather by the effect produced thereby on the mind of the victim. The means used, the age, sex, state of health and mental characteristics of the victims are all evidentiary, but the ultimate fact in issue is whether such person was

7. Before Paramount, jury instructions in criminal antitrust cases were in conflict. Compare United States v. Greater N. Y. Live Poultry Chamber of Commerce, 30 F.2d 939 (S.D.N.Y.1929), aff'd. 47 F.2d 156 (C.A.2 1931), cert. denied, 283 U.S. 837, 51 S.Ct. 486, 75 L.Ed. 1448 (1931) with United States v. Fish Credit Ass'n. Inc., Cr. 96-233 (S.D.N.Y.1933), aff'd. sub nom. United States v. Lanza, 85 F.2d 544 (C.A.2 1936), cert. denied, 299 U.S. 609, 57 S.Ct. 235, 81 L.Ed. 449 (1936). These instructions are reported in A.B.A. Section of Antitrust Law, Jury Instructions in Criminal Antitrust Cases: A Compilation of Instructions Given by United States District Courts.

8. Whether the asserted facts are sufficient to constitute coercion is a question of law for the court to decide. See, for example, W. R. Grimshaw Co. et al. v. Nevil C. Withrow Co., Inc., 248 F.2d 896,

903 (C.A.8 1957), cert. denied, 356 U.S. 912, 78 S.Ct. 669, 2 L.Ed.2d 585 (1958) (the Eighth Circuit found error in the trial court's submission to the jury of an interrogatory inquiring whether plaintiff had acted under duress); Furman v. Gulf Ins. Co. of Dallas, Tex., et al., 152 F.2d 891, 894 (C.A.8 1946); and Winget v. Rockwood et al., 69 F.2d 326, 330 (C.A.8 1934).

9. See, Swift Co. v. United States, 111 U.S. 22, 28-30, 4 S.Ct. 244, 28 L.Ed. 341 (1884); Oceanic Steam Nav. Co. v. Stranahan, 214 U.S. 320, 329, 29 S.Ct. 671, 53 L.Ed. 1013 (1909); Union Pacific R.R. Co. v. Public Serv. Commission of Mo., 248 U.S. 67, 70, 39 S.Ct. 24, 63 L.Ed. 131 (1918); and South Puerto Rico Sugar Company Trading Corp. v. United States, 334 F.2d 622, 627 (Ct. of Clms. 1964).

bereft of the free exercise of his will power. * * * " [10]

I-T-E has not demonstrated the absence of free choice necessary to constitute coercion. On the contrary, the statement in response to Local Pre-Trial Order No. 4 repeatedly relates instances of I-T-E's independent action. For example:

"8. In subsequent meetings of competitors at about this time [1931] and during the year or two which followed, General Electric and Westinghouse continually urged Scott [I-T-E's President] to make I-T-E's prices and terms and conditions of sale similar to those of General Electric and Westinghouse. Uniformity was insisted upon even for the items where I-T-E's price was higher than its competitors'. *When Scott refused to lower I-T-E's price on such items, General Electric said that it would raise its prices to achieve the desired uniformity notwithstanding the possible substantial loss of business it was getting in that product line, a position from which Westinghouse did not dissent.* * * * [11] (Emphasis supplied.)

"33. In November 1952 I-T-E submitted a quotation for the 440 volt auxiliary switchboards for CVA 60, the aircraft carrier Saratoga. General Electric had been awarded similar equipment on the first vessel of this class and I-T-E planned to get the second, if possible. When Scott instructed I-T-E's Sales Manager, Fred Getz, to make every effort to obtain the job, Getz told him that, based upon his conversations with General Electric and Westinghouse and his past experience, there was absolutely no doubt that General Electric and Westinghouse would not permit I-T-E to take it and, if I-T-E was competitive, there would be severe commercial repercussions affecting other business. *In spite of the warning, Getz was instructed to proceed and I-T-E got the job at $1,400,000 as compared with General Electric's bid of $1,800,000 for the first vessel of this class.* [12] (Emphasis supplied.)

"67. Notwithstanding discussions among competitors at the Traymore meeting referred to in paragraph 57 and at other meetings, *I-T-E personnel were instructed to run I-T-E's business their own way. For example, when Buck reported to Scott the proposed 4% allocation of sealed-bid business, Scott told him to forget it and Buck gave similar instructions to his subordinates.*" [13] (Emphasis supplied.)

In the above instances, I-T-E acted in direct defiance of the larger manufacturers' commands. Defendant cannot claim in one breath that it lost its will by "the threats and acts of coercion [which] are largely to be found in a mosiac of incidents stretching in time throughout virtually the entire history of the electrical manufacturing industry * * *," [14] and in the next assert that it was an aggressive competitor exercising its own business judgment. The examples cited by I-T-E lead inevitably to the conclusion that it acted freely at all times to pursue those goals which it believed were in its best interests.

10. See, Alloy Products Corp. v. United States, 302 F.2d 528, 530, 157 Ct.Cl. 376 (1962); Prudential Ins. Co. of America v. Osadchy et al., 54 F.Supp. 711, 713 (W.D.Mo.1944); Gill v. Reveley et al., 132 F.2d 975, 978 (C.A.10 1943); and Southern Ry. Co. v. Stewart, 115 F.2d 317 (C.A.8 1940).

11. I-T-E's Written Statement as Required by Local Pre-Trial Order No. 4 of March 9, 1965, and its Amended Written Statement dated April 5, 1965 are appended hereto as Appendix B.

12. Id. at 25.

13. Id. at 49.

14. Id. at 2.

**(2)** *I–T–E has failed to show that acquiescence was the only available alternative.*

Although coercion need not result from a single act,[15] the threatened party to successfully urge the defense must prove that it was deprived of any opportunity for alternative action[16] and that the threat was imminent and certain. In A/S Glittre v. Dill, 152 F.Supp. 934, 938 (S.D.N.Y.1957) (suit to recover a fine), the coerced payment was made to secure clearance papers needed for docking in U. S. ports. The court granted defendant's motion for summary judgment, finding that duress did not exist as a matter of law where the payment was made five weeks prior to the vessel's docking.

" * * * Hence, plaintiff's payment was anticipatory. It was not induced by a present, immediate and urgent necessity, but by a desire to avert a prospective and contingent event which presumably might take place in five weeks."

I–T–E has failed to cite a single instance in the 1940's or 1950's where its independent actions resulted in prompt retaliation against it by the major producers. This failure of proof is critical in view of the numerous examples of such actions described in its responses. Many years of participation in a conspiracy cannot be justified on grounds of coercion without a showing that harm resulted from attempts to throw off the illegal yoke.

**(3)** *I–T–E at all times had the alternative of a meaningful legal remedy.*

An adequate remedy at law will defeat the defense.[17] In Hartsville Oil Mill v. United States, 271 U.S. 43, 49, 46 S.Ct. 389, 70 L.Ed. 822 (1926) (contract suit against the Government), the Government moved to modify the contract (pursuant to its provisions) and threatened default unless the new contract was accepted within one hour. The Supreme Court held that "[b]efore the coercive effect of the threatened action can be inferred, there must be evidence of some probable consequences of it to person or property for which the remedy afforded by the courts is inadequate."

I–T–E cannot show its remedy at law was insufficient. Two legal remedies existed which it failed to pursue to fruition. The first was to bring suit for injunctive and/or treble damage relief under the Clayton Act.[18] The second was to report the illegal activities to the Justice Department. In 1940 I–T–E, through Mr. Scott, its President, took the initial step in this direction, and reported to the Justice Department that antitrust violations were occurring in the circuit breaker industry. Thurman Arnold, then Assistant Attorney General, responded requesting that Mr. Scott " * * * communicate with me [Ar-

---

15. Furnish et al. v. Commissioner of Internal Revenue, 262 F.2d 727, 733 (C.A.9 1958) (a taxpayer's and his former wife's petitions to review income tax deficiencies). "Duress" may consist of a "long continued course of mental intimidation," which "can be equally as effective [as a gun held to one's head], and perhaps more so."

16. Cahill v. New York, N. H. & H. R. R. Co., 351 U.S. 183, 190 n. 6, 76 S.Ct. 758, 100 L.Ed. 1075 (1956), Mr. Justice Black dissenting on other grounds; Fruhauf Southwest Garment Co. v. United States, 111 F.Supp. 945, 126 Ct.Cl. 51 (1953); Vines v. General Outdoor Advertising Co., Inc., 80 F.Supp. 281 (S.D. N.Y.1947); Hartsville Oil Mill v. United States, 271 U.S. 43, 49, 46 S.Ct. 389, 70 L.Ed. 822 (1926); Chesebrough v. United States, 192 U.S. 253, 259, 24 S.Ct. 262, 48 L.Ed. 432 (1904); and Radich v. Hutchins, 95 U.S. 210, 24 L.Ed. 409 (1877).

17. Bennett et al. v. Mahon, 180 F.2d 224 (C.A.8 1950); Freund et al. v. United States, 260 U.S. 60, 43 S.Ct. 70, 67 L. Ed. 131 (1922); Union Pacific R.R. Co. v. Public Service Commission of Mo., 248 U.S. 67, 39 S.Ct. 24, 63 L.Ed. 131 (1918); Silliman v. United States, 101 U.S. 465, 25 L.Ed. 987 (1879); and French v. Shoemaker, 14 Wall. 314, 81 U.S. 314, 20 L.Ed. 852 (1871).

18. 15 U.S.C. §§ 15 and 26.

nold] concerning this matter." [19] Mr. Scott did not communicate further. His present explanation is that he " * * * rather expected they [the Justice Department] would approach me further, which they never did." [20] He decided "with the changed circumstances accompanying the war * * * not to risk the competitor retaliation which he expected might follow from pursuing such a complaint." [21]

I–T–E has failed to establish that its two legal remedies were worthless. Although the possibility existed that retaliation might occur, the clear evidence of I–T–E's corporate vigor since discovery of the conspiracies argues the contrary. World War II afforded I–T–E an ideal opportunity to free itself of the alleged coercion. The favorable market for electrical equipment at the time [22] and its expansion into defense activities made I–T–E particularly invulnerable to retaliation.

(4) *I–T–E has failed to show any illegal threats.*

 Unless the threatened act is illegal, it does not constitute coercion.[23] This principle was succinctly stated in Automatic Radio Mfg. Co. Inc. v. Hazeltine Research, Inc., 176 F.2d 799, 804 (C.A.1 1949) (suit for royalties under a patent license allegedly entered into under threat of an infringement suit): .

" * * * Not all economic pressure constitutes 'duress' rendering a contract voidable. * * * [T]he pressure exerted must be wrongful; * * * a threat to resort to civil litigation is not such duress as to justify rescission of a transaction induced thereby even though there is no legal right to enforce the claim, * * *." (Emphasis supplied.)

There is no showing that the coercion allegedly exerted was illegal. I–T–E argues that General Electric's sales policy of meeting the lowest price quoted by a competitor "went beyond the requirements of fair competition for any single sale since that policy has as a substantial purpose the establishment of a uniform price and the elimination of price competition on succeeding transactions." [24] The meeting of competitors' prices may be completely legal. A major aim of the antitrust laws is an open economy in which the meeting of competitors' prices is the rule rather than the exception. I–T–E has not established that General Electric would have violated any law by carrying out its threats.

(5) *The alleged coercion did not stem from plaintiffs' acts.*

A further ground for striking I–T–E's coercion defense is that the duress did not emanate from the plaintiffs in these actions. The party asserting the defense must demonstrate that duress resulted from the opposing party's wrongful and oppressive conduct. I–T–E has neither alleged nor proved such facts.

19. Letter of Thurman Arnold to Max Scott, Jr., dated May 9, 1940, marked Exhibit D to Plaintiffs' Statement Pursuant to Paragraph (4) of Local Pre-Trial Order No. 4. Plaintiffs' Statement, Letter of Richard E. Powell to Judge Edwin A. Robson dated March 15, 1965, and Memorandum on the I–T–E "Coercion Statement" Required under Local Pre-Trial Order No. 4 are appended hereto as Appendix C.

20. National Deposition of W. Maxwell Scott, Jr., taken May 27–28, 1964 in Washington, D. C., at 115.

21. I–T–E's Statement Pursuant to Local Pre-Trial Order No. 4, op. cit., supra, note 13 at 22. Harry L. Buck (in his national deposition taken May 28, 1964 in Washington, D. C., at 111–112) stated that I–T–E feared the Justice Department would move too slowly to insure I–T–E's preservation.

22. This can be seen in the rapid sales increase during the period: from $1,813,-601 in 1939 to $8,189,378 in 1941 to $13-573,950 in 1942, and to $17,494,428 in 1943. I–T–E's Annual Reports for 1943 and 1946.

23. Kohen et al. v. H. S. Crocker Co., Inc., 260 F.2d 790 (C.A.5 1958); and Chatz v. Armour Plant Employees' Credit Union, 154 F.2d 236 (C.A.7 1946).

24. I–T–E's Statement Pursuant to Local Pre-Trial Order No. 4, op. cit., supra, note 13 at 61.

In W. R. Grimshaw Co. et al. v. Nevil C. Withrow Co., Inc., 248 F.2d 896, 904–905 (C.A.8 1957) (action by a subcontractor for extras allegedly not covered by the contract), one element of the alleged coercion consisted of defendant's threat to cancel the subcontract for plaintiff's non-performance, which in turn would have resulted in a cancellation charge to plaintiff by a sub-subcontractor. The court stated:

"An examination of the cases in the field of duress and economic coercion makes it clear that three elements are common to all situations where actionable duress has been determined to exist: (1) that one side involuntarily accepted the terms of another; (2) that circumstances permitted no other alternative; and (3) that said circumstances were the result of coercive acts of the opposite party. * * *

* * * * * *

"Withrow [the subcontractor] contended that the Ware Laboratories [the sub-subcontractor] might impose a cancellation charge if Grimshaw [the prime contractor] cancelled the contract, and that because of his financial condition, this might bankrupt him. *But the contention seems to be without merit, in that the alleged danger of a cancellation charge by a third party cannot be made the basis of a claim of duress between contracting parties.* * * * *" 25 (Emphasis supplied.)

Threats of third parties cannot be used by I–T–E as a defense against plaintiffs' actions.

25. See also, Lawrence v. Muter Co. et al., 171 F.2d 380, 382 (C.A.7 1949); and Arlington Towers Land Corp. et al. v. John McShain, Inc., et al., 150 F.Supp. 904, 914 (D.C.1957).

26. See also, Shell Oil Co. v. Cy Miller Inc., 53 F.2d 74 (C.A.9 1931); and Winget v.

(6) *I–T–E's failure to disavow the coercion promptly constitutes acquiescence.*

Failure to disclaim an involuntary act upon cessation of the coercion constitutes acquiescence which bars the defense. In Barnette v. Wells Fargo Nevada National Bank et al., 270 U.S. 438, 444, 46 S.Ct. 326, 328, 70 L.Ed. 669 (1926) (suit to cancel a deed three years after the conveyance), the Supreme Court held the contract valid based on plaintiff's delay in asserting coercion and disavowing the contract:

" * * * Nor need we consider any of the numerous defenses interposed, except the acquiescence of appellant in her deed, and her delay in asserting her rights, which, in the circumstances, are decisive of the case.

" * * * If there was duress here, appellant, as soon as she was relieved from its operation, was in a position either to disaffirm her conveyance or to allow it to stand undisturbed as the free and formal disposition of her rights. * * * In that situation she was subject to the requirement of equity that an election to disaffirm * * * must be exercised promptly." 26

I–T–E was obligated to disclaim its participation in the electrical equipment conspiracies at the earliest opportunity or be foreclosed from pleading the defense. I–T–E could have repudiated the conspiracy in those instances where it defied the larger manufacturers.27 After the electrical equipment indictments in Philadelphia, it had ample opportunity to disavow by asserting the defense in the Government's suits, or by cross-claiming against other defendants in the private damage actions.

Rockwood et al., 69 F.2d 326 (C.A.8 1934).

27. I–T–E has admitted attending over fifty meetings with competitors between 1931 and 1959. Surely I–T–E was presented with some opportunity to disaffirm its participation in the conspiracy during this period.

### III. I-T-E Has Failed to Comply with Local Pre-Trial Order No. 4.

▮ Additional grounds for striking I-T-E's coercion defense is its failure to comply with Local Pre-Trial Order No. 4. Rule 16, F.R.Civ.P., authorizes pre-trial proceedings to aid in the disposition of lawsuits by simplifying and reducing the issues in dispute. Not only are the courts authorized to limit the issues, but it is their duty to do so. As stated in Brinn v. Bull Insular Lines, Inc., 28 F.R.D. 578, 579 (E.D.Pa.1961) (a maritime case in which a pre-trial order was entered limiting the issues to whether defendant or third party defendant was liable):

> "If the pre-trial procedure is to have any meaningful purpose whatever, it is incumbent on the Court to narrow the issues reasonably and with discretion. * * * * " [28]

Pre-trial is particularly needed in protracted antitrust litigation.[29] In United States v. E. I. Du Pont De Nemours & Co., 11 F.R.D. 308, 310 (D.C.D.Del.1951), the court observed:

> "The issues pertaining to any action should be crystallized by the pleadings and by pretrial procedures. This seems specially apt to the trial of an antitrust suit involving complex facets of an industry under scrutiny. * * * "

Local Pre-Trial Order No. 4 was designed to crystallize the areas of dispute respecting I-T-E's coercion defense. It required a detailed statement of I-T-E's coercion evidence under nineteen separate topic headings. Defendant's response is completely insufficient and does not meet even minimum standards of compliance.

Paragraphs (3) (c) (iv) and (v) required I-T-E to describe "all understandings and agreement * * * reached at or as a result of any such [coerced] communication, conversation or meeting" and "each course of conduct undertaken by you as a result of any such communication, conversation or meeting * * * *." As the following examples show, the response to these paragraphs is particularly deficient:

A. Paragraph 15 of I-T-E's Statement alleges that Tom Watts of Westinghouse told Max Scott in 1934 that I-T-E "had better conform to a uniform price policy" for circuit breakers. The statement does not indicate whether I-T-E agreed to a uniform price policy, or what practice it in fact followed.

B. Paragraph 17 alleges that in 1936 R. W. Davis of Allis-Chalmers instructed Mr. Scott what price I-T-E should quote on a high tension bus job for Carnegie Steel Company. The statement does not relate I-T-E's response to this order, or the bid I-T-E submitted.

C. Paragraphs 18 and 19 allege that I-T-E received warnings in the mid-1930's about charging lower prices and upsetting the price levels on sales to steel mills and certain utilities. The statement does not reveal I-T-E's reaction to these warnings, or the policy followed.

D. Paragraph 29 alleges that shortly after World War II Mr. Tinnerholm of General Electric instructed I-T-E to protect General Electric's bid on a Ward's Island New York sewerage plant job. There is no indication whether I-T-E agreed to and did bid higher than General Electric.

E. Paragraph 31 alleges that in 1947 Mr. Tinnerholm told Mr. Scott that General Electric was content to leave the pricing of power switching equipment to the smaller manufacturers, but that if they failed to

---

28. See also, Life Music, Inc. v. Edelstein, 2 Cir., 309 F.2d 242 (C.A.2 1962) (the court in an antitrust action entered an order defining the areas of agreement over plaintiff's objection).

29. Handbook of Recommended Procedures for the Trial of Protracted Cases, 25 F.R.D. 351 (1960), adopted by the Judicial Conference of the United States, March 1960, at 37, 75.

maintain price stability, General Electric would take over policing the product line. The statement gives no information on whether I–T–E charged stable prices and policed the prices of other manufacturers.

F. Paragraphs 45 and 46 allege that in early 1958 I–T–E attended a series of competitors' meetings concerning quoting book prices on electrical equipment (particularly switchgears). Initially, H. L. Buck of I–T–E refused to agree with competitors' proposals, but further meetings were held. The statement fails to reveal if I–T–E maintained its original position, if it capitulated and agreed to quote book prices, and if in fact subsequent sales were made at book.

G. Paragraph 49 alleges that in late 1957 or early 1958 I–T–E was told to raise its power switchgear assembly prices or face a general lowering of the price level. No information is provided on I–T–E's reaction when the price level did in fact drop.

I–T–E predicated its coercion evidence with the qualification that it did not "provide every matter and every detail referred to in Local Pre-Trial Order No. 4 * * * [but that it set] forth the substance of the facts and contentions which are at least illustrative of I–T–E's position. * * *"[30] Local Pre-Trial Order No. 4 was explicit in requiring "all facts and contentions" re-

lating to I–T–E's defense. Illustrative examples are not sufficient to determine submissibility when a complete offer of proof has been required.[31]

I–T–E's non-compliance in its original statement resulted in the Court's directing the filing of an amended coercion statement[32] within two weeks. The amendment, when filed, consisted of only three pages and was confined to specific examples of non-compliance which the plaintiffs' statement had pointed out. Subsequently, I–T–E was allowed two weeks in which to file a reply to plaintiffs' second statement in response to Local Pre-Trial Order No. 4. It did not avail itself of this opportunity. Thus, not only has I–T–E failed to comply with Local Pre-Trial Order No. 4, but it has made no meaningful effort to provide the Court with the information available and necessary for this decision.

I–T–E has been given every opportunity to submit a complete and sufficient statement. When a party does not comply with the court's order, there is no alternative but to apply sanctions. It is clear that courts have, as indeed they must have, authority to regulate their practice and compel compliance with their reasonable mandates. This principle is codified in Rules 37 and 41, F.R. Civ.P., which specify sanctions for failure to comply with orders. The courts also have inherent power to enforce their orders. As stated in Link v. Wabash R. R. Co., 291 F.2d 542, 546 (C.A.7 1961), aff'd. 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.

---

30. I–T–E's Statement Pursuant to Local Pre-Trial Order No. 4 op. cit., supra, note 13 at 2.

31. I–T–E's answers in these cases assert that the "wrongful acts of coercion, duress and compulsion [to which it was subjected] * * * have resulted in substantial losses to I–T–E and have impaired its ability to effectively compete with them [General Electric, Westinghouse and Allis-Chalmers] and others." Answers of Defendant I–T–E to Plaintiffs' Complaint, op. cit., supra, note 6 at 3. Examination of I–T–E's growth since 1930 does not substantiate such claims of injury. I–T–E's net worth

grew from $1,074,692 in 1931 to $46,-479,263 in 1959, during which period I–T–E purchased seven small electrical manufacturers and expanded its operation from a two-line manufacturer to a multi-product producer. I–T–E's sales expanded from $1,813,601 in 1939 to $118,-500,718 in 1959. For details on I–T–E's growth see, Plaintiffs' Statement Pursuant to Paragraph (4) of Local Pre-Trial Order No. 4, op. cit., supra, note 21 at 2–11.

32. This instruction was made orally at a pre-trial conference on March 22, 1965. See page 14 of the transcript.

2d 734 (1962) (where the district court dismissed an action on its own motion for failure to prosecute):

"Courts may exercise their inherent powers and invoke dismissal as a sanction in situations involving disregard by parties of orders, rules or settings. * * * "

For this Court to do otherwise would be unjust to plaintiffs in these cases and to litigants in other actions pending before it. It is apparent that this defense was without foundation and was dilatory. In view of the time and effort that has been required to reach this conclusion, the Court would consider a motion to assess attorneys' fees and costs reasonably expended by plaintiffs.

IV. *Order*

For the foregoing reasons, it is ordered that:

1. Plaintiffs' motions to strike all portions of I–T–E's defenses of economic coercion in the actions listed in the caption to this memorandum are granted.

2. The pleadings in these actions are deemed modified to conform with the rulings on these motions without need for further formal amendment.

### Appendix A

### LOCAL PRE-TRIAL ORDER NO. 4

A pre-trial conference having been held, counsel having been heard, and due deliberation having been had, it is ordered severally in the above actions that:

(1) "Identify" when used as to an individual person means to state his full name and present address, if known, and his present or last known business position or affiliation. "Identify" when used with reference to a document means to state the date and author, type of document (e. g., letter, memorandum, telegram, chart, etc.) or some other means of identifying it and its present location or custodian. If any such document was, but is no longer, in the answering party's possession or control, state what disposition was made with respect to it.

(2) As used herein, the term "document" shall mean any book, pamphlet, periodical, letter, report, memorandum, record, study, working paper, paper, chart, graph, index, data sheet, data processing card or table, or any other writing, except those documents prepared solely for the purpose of this litigation.

(3)(A) In this paragraph, "you" or "your" shall mean I–T–E Circuit Breaker Company, its domestically domiciled subsidiaries and its merged or acquired predecessors, its present and former officers, agents and all other persons acting on behalf of I–T–E Circuit Breaker Company, or such subsidiaries or such predecessors, including all past or present employees exercising discretion, making policy and making decisions or participating in any of the foregoing functions with respect to the sale, pricing, marketing or manufacturing of power switchgear assemblies or components thereof;

(B) On or before March 9, 1965, you shall file with this Court a detailed written statement stating in separately numbered paragraphs all facts and contentions which relate to or bear on your defenses of "coercion, duress and compulsion" (First and Fourth Defenses) and your inability to refrain from participating in the alleged conspiracy in this product line, or any attempts made by you to withdraw from the conspiracy in this product line;

(C) Such written statement shall state the facts in sufficient detail for the Court to determine the submissible issues, to distinguish between those facts which you contend on the basis of the complaint or otherwise are admitted, and those which are contested, to determine the admissibility of the evidence offered to prove each of such facts;

(D) Such written statement shall:

(i) state the location and date of all communications, conversations and meetings which relate to or bear on such defenses;

(ii) identify the parties to or the participants in each such communication, conversation, or meeting;

(iii) describe fully the circumstances and substance of each such communication, conversation or meeting;

(iv) describe fully all understandings and agreement (whether explicit or tacit) reached at or as a result of any such communication, conversation or meeting;

(v) describe fully each course of conduct undertaken by you as a result of any such communication, conversation or meeting;

(vi) identify and describe fully the contents of all documents which relate to, bear on or reflect the details of any such communication, conversation or meeting;

(vii) set forth all facts respecting your inability to refrain from participating in the alleged conspiracy in this product line;

(viii) set forth your contentions respecting your inability to refrain from participating in the alleged conspiracy in this product line;

(ix) set forth all facts respecting any attempts made by you to withdraw from participating in the alleged conspiracy in this product line;

(x) set forth your contentions respecting any attempts made by you to withdraw from participating in the alleged con-

spiracy in this product line;

(xi) identify and describe fully the contents of all documents which relate to, bear on or reflect the facts respecting your inability to refrain from participating in the alleged conspiracy in this product line;

(xii) identify and describe fully the contents of all documents which relate to, bear on or reflect your contentions respecting your inability to refrain from participating in the alleged conspiracy in this product line;

(xiii) identify and describe fully the contents of all documents which relate to, bear on or reflect the facts respecting any attempts made by you to withdraw from participating in the alleged conspiracy in this product line;

(xiv) identify and describe fully the contents of all documents which relate to, bear on or reflect your contentions respecting any attempts made by you to withdraw from participating in the alleged conspiracy in this product line;

(xv) identify the portions of all national depositions which relate to or bear on your defenses of "coercion, duress, and compulsion," and your inability to refrain from participating in the alleged conspiracy in this product line, or any attempt made by you to withdraw from partici-

pating in such alleged conspiracy;

(xvi) identify and describe fully the contents of all documents produced in a national document depository which relate to, bear on or reflect your defenses of "coercion, duress, and compulsion," and your inability to refrain from participating in the alleged conspiracy in this product line, or any attempt made by you to withdraw from participating in such alleged conspiracy;

(xvii) identify all potential trial witnesses in these actions whose testimony would relate to or bear on your defenses of "coercion, duress, and compulsion," and your inability to refrain from participating in the alleged conspiracy in this product line, or any attempt made by you to withdraw from participating in such alleged conspiracy, and describe separately the testimony of each such potential witness;

(xviii) identify and describe fully the contents of all other documents and set forth in detail all other facts which relate to, bear on or reflect your defenses of "coercion, duress, and compulsion," and your inability to refrain from participating in the alleged conspiracy in this product line, or any attempts made by you to withdraw from participating in such alleged conspiracy;

(xix) identify and describe fully the contents of all other documents and set forth in detail all other of your contentions which relate to, bear on or reflect your defenses of "coercion, duress, and compulsion," and your inability to refrain from participating in the alleged conspiracy in this product line, or any attempts made by you to withdraw from participating in such alleged conspiracy;

(4)(A) On or before March 23, 1965, plaintiffs in these actions shall file with this Court a detailed written statement in reply to the statement herein ordered to be filed by I-T-E Circuit Breaker Company.

(B) Such written statement shall state in separately numbered paragraphs the contentions of such plaintiffs with respect to each fact and contention set forth in I-T-E Circuit Breaker Company's written statement, and such additional facts and contentions which such plaintiffs believe relate to or bear on I-T-E Circuit Breaker Company's defenses of "coercion, duress, or compulsion," its inability to refrain from participating in the alleged conspiracy in this product line, or any attempts made by it to withdraw from participating in such alleged conspiracy.

(C) Such written statement shall state the facts in sufficient detail for the Court to determine the submissible issues, to distinguish between those facts which plaintiffs contend on the basis of the answers or otherwise are admitted, and those which are contested, to determine the admissibility of the evidence offered to prove each of such facts.

(D) In preparation for such written statement, plaintiffs shall have such discovery by depositions, written interrogatories or otherwise, as they shall deem necessary on any issues raised or made

by the written statement of I–T–E Circuit Breaker Company.

(5) Any factual issue, legal issue, contention, claim, affirmative matter, or defense not set forth in detail as provided herein in paragraphs (3) and (4) shall be deemed abandoned, uncontroverted, or withdrawn in further proceedings, the pleadings and other papers on file herein to the contrary notwithstanding, except for facts, issues, contentions, claims, affirmative matters, or defenses of which a party may not be aware at the time of filing a written statement in the exercise of reasonable diligence. Any such matters of which a party is not aware in the exercise of diligence at the time of filing a written statement may be presented by supplemental written statement upon a showing of good cause.

Appendix B

WRITTEN STATEMENT OF DEFENDANT I–T–E CIRCUIT BREAKER COMPANY REQUIRED BY LOCAL PRETRIAL ORDER NO. 4

Defendant I–T–E Circuit Breaker Company makes the following written statement as required to be filed on or before March 9, 1965 by Local Pretrial Order No. 4 which was entered by the Court on March 2, 1965, over I–T–E's objection.

I.

Among other things, some of which are set forth at the foot of this written statement, the nature of I–T–E's Fourth Defense and related portions of its First Defense as set forth in its answers to the plaintiffs' complaints, the nature and extent of the information in support of it which is presently available, and the time available for the preparation of this written statement are such that it is impossible for I–T–E to provide every matter and every detail referred to in Local Pretrial Order No. 4. However, I–T–E believes that the following statement sets forth the substance of the facts and contentions which are at least illustrative of I–T–E's position with respect to its Fourth Defense and related portions of its First Defense.

II.

1. The facts upon which these defenses are based are not a few sharp, isolated events susceptible of clear and precise description. On the contrary, while there are some such events, the threats and acts of coercion are largely to be found in a mosaic of incidents stretching in time throughout virtually the entire history of the electrical ·manufacturing industry and across many product lines. Many of the incidents, seemingly colorless to an outside observer, have significance to a person who has grown up in the industry when viewed in the context of past events and traditional patterns of action on the part of the largest companies in the industry. Every statement made or action taken by a responsible official of General Electric or Westinghouse or Allis-Chalmers must be weighed in the light of that company's position in the industry and its past attitudes and practices.

2. In evaluating the statements or actions of General Electric, Westinghouse and, to a lesser extent, Allis-Chalmers, the officer or manager of a smaller electrical manufacturer has a background of knowledge and awareness of:

(a) *The gigantic size of his major competitors.*

General Electric and Westinghouse have had annual sales in recent years of four or more billion dollars and about two billion dollars, respectively. Since the turn of the century, they have occupied the same relative position with respect to their smaller competitors, for the most part, although, of course, their sales volume then was smaller than at present.

(b) *The diversification of their activities.*

Each of the major companies, and particularly General Electric and Westinghouse, have income from

sales of products unrelated to any single product which might be the subject of competitive controversy with the smaller, single-line or short-line manufacturer.

(c) *Uniform action and cooperation of the major companies.*

General Electric and Westinghouse, and frequently Allis-Chalmers, have acted uniformly and cooperated with each other to the disadvantage of their smaller competitors on innumerable occasions over many years.

3. Another overriding principle affecting an evaluation of the significance of the major companies' statements and acts is an understanding of the respective goals of the larger and the smaller companies. One of General Electric's business methods has been to preserve price uniformity and to eliminate price competition in each segment of its business over the long run. It has been willing to sell at any reasonable price, whether high or low, and sometimes at unreasonably low prices, so long as that price and those of its competitors did not reflect significant variations. This approach is directly opposed to what is generally true for other smaller companies who for a variety of reasons, many of which are transient in nature, exercise some flexibility in pricing one or more of their products. Over the years, Westinghouse has shared these goals and methods with General Electric.

4. The business which is now I–T–E began in 1888. In 1891, it was incorporated as Cutter Electrical and Manufacturing Company, a New Jersey corporation. In 1927, the company's name was changed to I–T–E Circuit Breaker Company. In 1939, the present I–T–E Circuit Breaker Company, a Pennsylvania corporation, succeeded the earlier New Jersey company.

5. In 1930, and again in 1931, E. Swift Newton, then I–T–E's Sales Manager, who was impressed with the impending problems of competition with General Electric and Westinghouse and of the depression, negotiated with John Upp, then Manager of General Electric's Elmwood Avenue Switchgear Works, for the sale of I–T–E to General Electric. Such a sale was virtually completed on two occasions, once in 1930, and then again in early 1931, but was forestalled each time by other stockholder interests.

6. When General Electric's efforts to buy I–T–E failed, Upp through E. Swift Newton drew W. M. Scott, Jr., now the President of I–T–E, into a series of conversations relating to the pricing of what were then its only products, low voltage large air circuit breakers and switchgear assemblies. Others present at one or more of these meetings included F. W. Patterson, and possibly Starbuck, of General Electric, R. A. Neal, Jack Butts, and, sometime later, Tom Watts, of Westinghouse. At these early meetings, Scott was told, principally by Upp, that I–T–E should get together with the industry to discuss uniform prices, that the electrical industry was operated that way, that many customers knew about it, and that, notwithstanding some opposition, some accepted it. Scott was specifically told that I–T–E would have to cooperate on prices and stop quoting non-uniform prices. One transaction which served as an illustration in that discussion was a bid to American Gas & Electric for a 440 volt switchboard costing about $40,000. Upp said that General Electric was not concerned as much about the gain or loss of the job as it was about the non-uniformity of the prices. Such non-uniformity on I–T–E's part caused great embarrassment when customers compared the range of prices for such equipment with the virtually identical prices submitted by General Electric and Westinghouse in the heavier lines such as steam turbine generators and oil circuit breakers. General Electric and Westinghouse had theretofore explained such similarity on the basis that each manufacturer used about the same amounts of labor and material to produce a given item and thus the prices might reasonably be expected to be alike, but this explanation was questioned when a smaller company submitted

a significantly lower bid than General Electric in another related product line.

7. With reference to the illustrative example, Upp said that, as soon as a significant deviation appeared, General Electric had quoted substantially below what it expected I–T–E's price to be even though it believed the fair price was substantially above I–T–E's price. He said that General Electric would uniformly take this action unless it was informed in advance of I–T–E's price. Whether it made a profit on the sale or not, General Electric had to be virtually certain that it would equal the low bidder or it would submit a bid which almost certainly would be low. A far more important consideration to General Electric was forestalling the attack upon the uniform pricing of million dollar items which would arise from I–T–E's refusal to cooperate on much smaller items. However, General Electric could always explain a difference in price if it was the low bidder by attributing I–T–E's higher price to the inefficiency of a small company.

8. In subsequent meetings of competitors at about this time and during the year or two which followed, General Electric and Westinghouse continually urged Scott to make I–T–E's prices and terms and conditions of sale similar to those of General Electric and Westinghouse. Uniformity was insisted upon even for the items where I–T–E's price was higher than its competitors'. When Scott refused to lower I–T–E's price on such items, General Electric said that it would raise its prices to achieve the desired uniformity notwithstanding the possible substantial loss of business it was getting in that product line, a position from which Westinghouse did not dissent. On other occasions, General Electric and Westinghouse insisted that I–T–E change its pricing policy from one which was "f. o. b., Philadelphia, customer pays the freight" to "f. o. b., Philadelphia, freight allowed", thus looking toward a uniform price at the point of delivery. Similarly, the two major companies insisted that an I–T–E 10% discount for cash purchases of large air circuit breakers be eliminated or, alternatively, that the net price after discount be the same as the net prices of General Electric and Westinghouse.

9. In 1932, I–T–E and Westinghouse entered into negotiations looking toward the licensing of I–T–E to manufacture and sell molded case circuit breakers under certain Westinghouse patents. At the time of these negotiations, Westinghouse had substantial patent control over the manufacture and sale of this product, which was a necessary component of some switchboards and switchgear assemblies. In its dealings with the independent switchboard assemblers, Westinghouse had sometimes insisted that the assembler who wanted molded case circuit breakers buy Westinghouse large air circuit breakers as well and, at other times, it had refused to sell molded case circuit breakers at all except as components of switchboards assembled by it. Westinghouse had given licenses for the manufacture of these circuit breakers to about six important assemblers who, under the terms of those licenses, were obliged to sell complete switchboards and panelboards at prices determined by Westinghouse.

10. During the course of the negotiations referred to in paragraph 9 which were carried on by Scott for I–T–E and Victor Beam of Westinghouse, it was stated that Westinghouse was not so much interested in receiving royalties under the patent licenses as it was in using such licenses for fixing prices. At the stage of the negotiations when it appeared that the patent licenses would be granted to I–T–E, Westinghouse made it known that it was simultaneously attempting to subject the independent switchboard and panelboard assemblers to price control through the terms of licenses based upon the Jennings patent, a significant circuit breaker panelboard patent. This move in itself constituted a grave threat to I–T–E since the sale of circuit breakers to the independent assemblers constituted I–T–E's largest market and any limitations imposed upon the assemblers' ability to price their product freely would undoubtedly restrict their

sales and have a direct and immediate impact upon I–T–E as their supplier.

11. Initially, the Westinghouse objective in the negotiations referred to in paragraph 9 was a license which would have precluded I–T–E from selling molded case circuit breakers except as parts of completely assembled switchboards which, in turn, would be subject to Westinghouse price control. During these negotiations, Scott was told by Ray Frenger and Anderson of Westinghouse, who were Beam's associates in the negotiations, that only companies who would cooperate with Westinghouse on prices in general would be considered for patent licenses. As granted, the license provided that I–T–E might sell molded case circuit breakers separately but only at prices to be determined by Westinghouse and, further, that there should be no deviation from such prices either directly or indirectly by giving to the customer any other consideration, the effect of which would be to sell at more favorable prices, terms and conditions of sale. The latter provision was interpreted to mean that, if molded case circuit breakers were sold with other I–T–E equipment, the price charged for the latter could not be less than prices regularly charged by I–T–E for such items. The four licenses, denominated "A", "B", "C" and "D", were dated August 1, 1933. "A", "B" and "C" were the licenses for molded case circuit breakers. "D" related to patents on large air circuit breakers but this license was never used by I–T–E. The pricing provision referred to is in Article VI. The price fixing provisions of these licenses continued in force until about 1948 when Westinghouse brought about their cancellation.

12. These Westinghouse patent licenses, which dealt with an increasingly vital element of I–T–E's product line, were a powerful weapon for Westinghouse for a period continuing at least until the late 1940's and early 1950's, and, in some respects, until about 1959. The problems which could have been created for I–T–E by virtue of these licenses were significant factors in bringing I–T–E into discussions with competitors relating to prices.

13. The threat presented by the Westinghouse patent licenses was magnified by Scott's knowledge of earlier patent litigation against I–T–E. During the years 1905 to 1909, I–T–E (then Cutter) had been the defendant in patent litigation involving the Wright-Aalborg patent, which was important in the manufacture of what are now called large air circuit breakers. The ostensible plaintiff was Westinghouse, but it later appeared that the controlling force in the litigation was the Board of Patent Control, a committee jointly established by General Electric and Westinghouse to police a cross-licensing agreement entered into by the two companies in 1896. The outcome of this disastrous litigation was its settlement in 1909 on a basis which provided for the transfer of 49% of Cutter's stock to General Electric which, in turn, transferred 39% of its interest to Westinghouse. (This division of Cutter stock between General Electric and Westinghouse was consistent with Scott's understanding that the 1896 agreement provided for a division of the business available to General Electric and Westinghouse on a 60–40 (or 62½–37½) basis by providing, among other things, for an ascending schedule of royalties to be paid to the party getting less than its agreed upon share of the business.) General Electric and Westinghouse continued as shareholders until 1911 when they resold their stock to its former owners.

14. The events which followed further demonstrated to Scott the extent to which General Electric and Westinghouse, working together, dominated the electrical manufacturing industry. In October 1934, I–T–E submitted a bid and was awarded a contract for segregated phase metal-enclosed bus (the forerunner of isolated phase bus) for Boulder Dam. I–T–E's bid was about $225,000 and the bids of the four other suppliers were grouped at about $500 intervals at about $285,000, with Westinghouse the lowest of the four. This was I–T–E's first experience in this product line and the uni-

formity of the bids of the other companies tangibly reinforced Upp's earlier statements about the extent to which the industry was controlled and the dominant position of General Electric and Westinghouse in the industry.

15. The power of General Electric and Westinghouse was further demonstrated when I–T–E made its first sale of circuit breakers to the U. S. Navy about 1934. After I–T–E got the job, Scott was told by Tom Watts of Westinghouse, in the presence of representatives of General Electric, that, now that I–T–E was in this product line, it had better conform to a uniform price policy. Watts pointed to the ability and intention of General Electric and Westinghouse to combine the sale of circuit breakers and switchgear with the auxiliary power turbine generators in a way which minimized the number of jobs which I–T–E would get. He also pointed to the degree of cooperation which existed between General Electric and Westinghouse, which went so far as agreeing not only about the price to be submitted for such turbine generators but the efficiency rating as well. The effort of General Electric and Westinghouse on this occasion was to persuade I–T–E to increase its prices for this equipment. The effect of such action at the time would have been to tend to slow I–T–E's expansion as a newcomer in this product line since, at equal prices, the established manufacturers had greater customer acceptability.

16. Another illustration of General Electric-Westinghouse cooperation occurred in 1935 or 1936 when Scott was accused of making a low bid by Harold Winder of General Electric. When Scott demurred, Winder showed him a memorandum from Westinghouse reporting I–T–E's price notwithstanding the absence of any publicly available information about I–T–E's price on that job. This exchange of information about the competitive activities of smaller companies continued among General Electric, Westinghouse and, to some extent, Allis-Chalmers until at least the mid-1950's. On numerous occasions, one of the major companies would couple with the report of its knowledge of the smaller company's bid a statement that low quotations by the smaller company would necessarily bring lower quotations from the major companies as well.

17. About 1936, I–T–E quoted a price for high tension bus to be supplied the Duquesne Works of Carnegie Steel Company. As I–T–E was preparing to quote, Scott was called by R. W. Davis of Allis-Chalmers, who said that he had met with General Electric and Westinghouse to arrange the prices for all of the equipment to be supplied and I–T–E was to quote $36,000 (?) for the bus portion of the job. The call was not pre-arranged and was entirely unsolicited by I–T–E, although it was not surprising to Scott in view of the intense interest which the major companies demonstrated in sales to large industrial purchasers such as steel mills. When Scott suggested to Davis that Scott had planned to bid $3,000 or $4,000 more, Davis, in essence, said "No, that's the price. If you don't want it, then bid higher and someone else will take it."

18. In the mid-1930's, the principal suppliers of large steel mill motors and motor-generator sets were General Electric, Westinghouse and Allis-Chalmers. Since General Electric and Westinghouse supplied their own large air circuit breakers for the control of such equipment, Allis-Chalmers was the principal market for I–T–E. Scott was told by Davis that Allis-Chalmers would not buy I–T–E's 600 volt circuit breakers for these applications unless I–T–E did not disturb the price agreement for steel mill electrical purchases then existing among the three major manufacturers.

19. Scott learned of the special interest of General Electric, Westinghouse and Allis-Chalmers in sales to steel mills on at least two occasions during the period 1934–1938. Scott was warned by Francis Fairman, then an important official of General Electric's Switchgear Works, and Davis, of Allis-Chalmers, that the price levels for at least some electrical equipment sold by General Electric, Westing-

house and Allis-Chalmers to steel mills were somewhat higher than the price levels to other purchasers and that in no circumstances would I–T–E be permitted to charge lower prices to such purchasers. The major companies believed that they could obtain the higher prices from steel mills because of their large purchases of steel. A similar situation existed for purchases by utilities who employed certain consulting engineering firms. There, the additional engineering detail that was required by the outside consultants was alleged to justify the higher price. There, too, I–T–E was warned not to upset the price levels.

20. About 1937 I–T–E quoted to the Bethlehem Steel Company a price of approximately $40,000 for a 250 volt DC switchboard which was about 10% lower than that which was offered by General Electric. General Electric learned of I–T–E's bid and cut its own quotation by twice that amount. Thereafter, General Electric's Francis Fairman told Scott that General Electric would always cut its price twice as much as any I–T–E cut if I–T–E ever ventured to underbid General Electric again.

21. In the mid-1930's Davis, of Allis-Chalmers, told Scott that there was no alternative to uniform prices. Davis said that free quoting was absolutely impossible and any such free quoting would result in a price war with prices of 40% off book, which would be absolutely ruinous to the manufacturers, and Scott understood that this was specially applicable to I–T–E.

22. During the depression the major companies attempted to use the NRA as a tool to minimize the price competition of their smaller competitors. Among other things, the code applicable to I–T–E required filing of price lists and prohibited sales at other than the price-list prices until such time as the price lists were changed after giving appropriate notice. When these measures were adopted, Scott was told by Ray Frenger, of Westinghouse, and by others, that finally the pricing practices of the independent companies had been tied down.

23. About the middle of 1938 I–T–E introduced 5 KV metal-clad air switchgear. It was I–T–E's desire to sell this improved product at about the same level as the corresponding equipment of General Electric and Westinghouse which employed oil circuit breakers. General Electric and Westinghouse insisted that the price level should be about 130% of switchgear embodying oil circuit breakers. Scott was told this at least once and R. E. Murphy, then I–T–E's Sales Manager, was also probably given the same instruction.

24. By 1938 or 1939, the concept of the low voltage unit substation was becoming very rapidly accepted. In such equipment, transformers and switchgear were manufactured and sold together as a single unit, thus eliminating the necessity of their connection by the purchaser. I–T–E was at a disadvantage since it did not then make transformers for such an application. However, I–T–E redesigned its switchgear so that it could be readily bolted by means of a throat connection to transformers manufactured by others. I–T–E was summoned to attend three or four meetings with General Electric, Westinghouse and Allis-Chalmers. It was told that the sale by I–T–E of separate switchgear adapted for substation connection created a variety of non-uniform price situations and that I–T–E must stop selling switchgear with throat connections or there would be a price war. As an inducement, General Electric and Westinghouse said that Allis-Chalmers would buy from I–T–E all of its requirements for circuit breakers for installation in such substations but Allis-Chalmers informed I–T–E that it would require a substantial discount on such purchases. If I–T–E did not acquiesce, the prices to be quoted by the major manufacturers would deteriorate quite rapidly. They also announced that they would not separately sell medium power transformers with throat connections so that it would be useless as a practical matter for I–T–E to sell throat-connecting switchgear with the expectation of later connection to transformers of these suppliers.

General Electric and Westinghouse continued to refuse to sell such transformers to I–T–E through World War II and thereafter, although, in time, Allis-Chalmers did supply some transformers and by the 1940's I–T–E had persuaded independent transformer manufacturers such as Wagner Electric and Pennsylvania Transformer to fill its orders. Even this was not a completely satisfactory solution since the acceptability of the smaller transformer manufacturers was significantly less than that of General Electric and Westinghouse. A similar situation existed after the war with respect to air-insulated power transformers which came to be used in such substations. Both General Electric and Westinghouse persisted in their refusal to sell such transformers to I–T–E for this application. One or more of the meetings referred to above were attended by Scott and R. E. Murphy for I–T–E.

25. Sometime before Pearl Harbor, about 1938 or 1939, I–T–E determined to quote on the 440 volt auxiliary switchboards required for battleships 55 and 56 (the North Carolina and Washington). Scott was approached by H. Van Erben, then Manager of the Switchgear Works of General Electric, and subsequently a Vice President of the company. Van Erben announced that General Electric and Westinghouse had agreed that General Electric would get the job, that he had heard that I–T–E would bid, that I–T–E should bid a figure above General Electric's, and that other ships would be assigned to I–T–E in due course. Furthermore, he warned I–T–E that, if I–T–E got the job, General Electric would refuse to sell it shockproof relays which were a necessary component of the switchboards. When Scott suggested that he would go to Westinghouse for these relays, Van Erben replied that Westinghouse had already agreed that General Electric would get the job and, accordingly, he was sure he could persuade Westinghouse not to sell the relays to I–T–E. I–T–E bid about $750,000 and General Electric took the job at about $550,000, which I–T–E believed to be an unreasonably low price.

The Navy Department subsequently indicated that it had expected to pay about a million dollars for this equipment. This transaction was further proof that General Electric was prepared to undersell drastically any competitor who ventured to interfere with General Electric's getting a contract it wanted.

26. About the start of World War II, I–T–E was visited by an agent of the Department of Justice, who was investigating a problem related to the manufacture and sale of transformers using a General Electric non-inflammable, liquid insulating material called Pyranol. This visit, coupled with the difficulties I–T–E had had in obtaining transformers for unit substations, led Scott to tentatively consider a complaint to the Justice Department. However, with the changed circumstances accompanying the war, Scott decided not to risk the competitor retaliation which he expected might follow from pursuing such a complaint.

27. I–T–E's experience with attempts of General Electric and Westinghouse to control prices through patents was paralleled by other members of the industry. Thus, Allis-Chalmers was subject to price control from Westinghouse and General Electric through patent licenses on network transformers and an insulating material variously referred to as Pyranol, Inerteen or Askerol.

28. Immediately after World War II, apparently in concert, Westinghouse and General Electric further demonstrated their power over I–T–E by refusing to sell I–T–E low voltage network protectors over which they exercised complete control by, among other things, patents and design and maufacturing techniques. This put I–T–E at a substantial competitive disadvantage in the sale of some switchboards for which this product was an essential component.

29. Another incident, shortly after World War II, involved equipment needed for the sewage plant for Ward's Island, New York. Scott was told by Tinnerholm, of General Electric, that General Electric was going to get that job at

any price and I–T–E should protect General Electric's bid or General Electric would bid an inordinately low price.

30. During the period 1945–1949, General Electric increased the number of products for which it developed printed price sheets. Scott was told by General Electric's Jack Hoffman that he had been ordered to get everything possible in the switchgear lines on printed price sheets since General Electric was worried about antitrust problems and the use of price sheets might minimize the risks in that respect. In a context where General Electric sought to control prices, this report to Scott was a further threat that prices were to be uniform and that printed price sheets would make it easier for General Electric to monitor the pricing of each of its competitors.

31. About the time in 1947 when I–T–E acquired Railway and Industrial Engineering Company, a manufacturer of power switching equipment, Scott spoke with Tinnerholm of General Electric about the power switching equipment business. Tinnerholm said that General Electric was primarily interested in the stability of prices of power switching equipment and that it was satisfied to leave that product line and the price policing of it largely to the independent companies so long as there was price stability even though it cost General Electric some business. However, Tinnerholm said that, if the independent companies failed to maintain stable prices, General Electric would compete aggressively and take action which might very well result in cuts of 40% below book prices if that were necessary to bring about stability.

32. Shortly after World War II Tinnerholm explained General Electric's pricing policy to Scott. He used an item for which the General Electric price might be assumed to have been $1,000. General Electric did not object if I–T–E could sell that item at that price on the basis of quality, delivery, service or friendship but General Electric did object to nonuniform price offers. If I–T–E lowered its price to make the sale, General Electric would systematically lower its price to I–T–E's or lower, first on a job-by-job basis and then it would very quickly lower its catalogue price. This would occur whether the I–T–E price was $999, $800 or $600 and without regard to the unreasonableness of the lower price. Therefore, why doesn't I–T–E give up and sell at $1,000 in the first place? The same thought was expressed by Tinnerholm in conversations with Scott on several occasions and, on numerous occasions, approved by representatives of Westinghouse.

33. In November 1952 I–T–E submitted a quotation for the 440 volt auxiliary switchboards for CVA 60, the aircraft carrier Saratoga. General Electric had been awarded similar equipment on the first vessel of this class and I–T–E planned to get the second, if possible. When Scott instructed I–T–E's Sales Manager, Fred Getz, to make every effort to obtain the job, Getz told him that, based upon his conversations with General Electric and Westinghouse and his past experience, there was absolutely no doubt that General Electric and Westinghouse would not permit I–T–E to take it and, if I–T–E was competitive, there would be severe commercial repercussions affecting other business. In spite of the warning, Getz was instructed to proceed and I–T–E got the job at $1,400,000 as compared with General Electric's bid of $1,800,000 for the first vessel of this class.

34. In 1953, Tinnerholm, who had been general manager of General Electric's Switchgear Division, told Burens that he had the industry under his thumb and that General Electric's competitors would do what he asked them to do.

35. In late 1954 and continuing into 1955, there was a price war, sometimes referred to as the "white sale", involving many heavy electrical equipment product lines, including most of such lines made by I–T–E. During this period, the prices were lowered to a point far below cost, where I–T–E and many similarly situated companies could not long continue to do business.

36. It was the policy of General Electric's divisions which sold power equipment such as the transformer division to quote the same prices at the same general levels to all types of customers. During the "white sale" in 1954 and 1955, it was the belief of the General Electric managers that the only way to stop prices of power transformers from deteriorating further was for General Electric to continue to be very aggressive at the market-place with the hope that prices would firm up and get back to some kind of a survival level. Ginn of General Electric discussed this policy with his associates R. W. Smith and Seaman and with more highly placed people at General Electric such as Paxton and Erben, who urged him to continue to be aggressive.

37. Late in 1954, Burens believed General Electric was not getting a large enough share of the business so he instructed his subordinates to quote whatever lower prices were necessary to get the orders.

38. Late in 1955 or early in 1956, Scott discussed the price war situation with James Jewell, Westinghouse's Vice President of Sales. Jewell said that the price war had been a terrible thing for Westinghouse and that he had sat on a daily basis with Gwilym Price, Westinghouse's President, discussing developments in the deeply cut prices then being quoted. Jewell described it as very serious, and said that "we were fighting for our lives" and that a similar experience in the future could lead to the serious damage or impairment of Westinghouse. When Scott suggested that these price war problems could have been avoided if each manufacturer freely quoted prices at which it could economically do business, Jewell said that such a course was impractical, that Scott had underestimated the impact of what General Electric would do if prices were freely quoted by others, and that even some relatively small deviation might quite possibly trigger a price war in the future. With respect to the 1954–55 price war, Jewell also observed, "I could have stopped it all if I could have gotten to Van, but unfortunately Van was in the hospital." (The "Van" referred to is Van Erben of General Electric.) To Scott this conversation was a clear warning that material price deviations by I–T–E and others should be eliminated in the future, that, if they were not, there would probably be another price war, that such a price war of an intensity sufficient to damage or impair Westinghouse would certainly ruin a much smaller company such as I–T–E, and that the relationship between General Electric and Westinghouse was such that they could together control events for the future of the industry.

39. In the second half of 1955, Scott had a conversation with either Tinnerholm or possibly George Burens, of General Electric. The General Electric representative said that Kelman Electric and Manufacturing Company, a manufacturer of outdoor power circuit breakers in Los Angeles which was subsequently acquired by I–T–E, had been a considerable thorn in General Electric's side for a long time. Prior to the 1954–1955 price war, General Electric had felt it unwise to do much about Kelman because it did not wish to depress the prices of power circuit breakers nationally. However, the price war had had one advantage in that it had offered an opportunity for General Electric "to settle old scores" with Kelman. General Electric had then quoted prices cut to approximately 53% to a purchaser in southern California who regularly did business with Kelman (either the Los Angeles Department of Water and Power or Southern California Edison). The General Electric representative then observed that he thought this action should go a long way toward impairing Kelman's competitive position in the future.

40. At one of the 1958 meetings of the Electrical Manufacturers' Club, at the Homestead Hotel, Hot Springs, Virginia, Scott had a conversation with Joseph Singleton, an Allis-Chalmers Vice President. Singleton told Scott that General Electric, Westinghouse and Allis-Chalmers had been successful in sta-

bilizing turbine-generator prices and had just put through a 3% price increase. Singleton, among other things, stated that I–T–E's Switchgear Division was quoting free prices in its product lines, which, in turn, was upsetting the electrical power equipment industry. When Scott asked about General Electric's attitude, Singleton offered to arrange an appointment with a highly placed General Electric official. Again, Scott found a threat in this conversation from the critical nature of the comments made by a highly placed officer of a larger competitor and the representation that the three largest companies in the industry were working together to enforce price stability for the industry.

41. It was probably at this same meeting of the Electrical Manufacturers' Club, or perhaps a preceding or succeeding one, that Scott was shooting skeet in the presence of A. C. Monteith and Hodnette, Vice Presidents of Westinghouse. One of the two observed to Scott that there was such a thing as "turn about" to be used against companies that quoted too low prices. To Scott, the implication was clear. "Turn about" was the practice employed from time to time by competitiors participating in price discussions whereby each would take a turn at quoting an extremely low price when a non-participating competitor was known or expected to bid.

42. The situation with respect to Kelman illustrates the manner in which General Electric has dominated the industry by containing its smaller competitors and preventing their natural expansion. Kelman had been a long established manufacturer of oil circuit breakers, with its plant in Los Angeles and most of its customers in the Southern California area. In 1937 Kelman was drawn into patent license negotiations with General Electric, which were conducted by Fred Cole for Kelman, and Strang, Van Erben and Traver for General Electric. During the course of the negotiations, Cole stated Kelman's intention of moving east and was met with the General Electric reply that, if that

happened, General Electric would have to lower its prices. Kelman did not come east and the patent license entered into as of November 20, 1937 effectively limited Kelman's sales to the Southern California area by permitting it to make royalty-free sales at prices determined by it in that area while sales made outside that area were required to be at General Electric's prices and subject to a 5% royalty. The price-fixing provision of the Kelman license was cancelled by General Electric about 1947. I–T–E, believing the license to be illegal for this and other reasons, terminated it in all respects in 1957, shortly after its acquisition of Kelman. See Articles 3, 4, 6 and 11 of that agreement.

43. I–T–E had never been in the outdoor oil circuit breaker business before it acquired the stock of Kelman in the summer of 1956. As pointed out above in paragraphs 39 and 42, Kelman was a small company with a narrow product line, most of which it sold to a small number of purchasers in southern California. I–T–E could not immediately expand Kelman's marketing activities because of the inherent limitations of Kelman's organization. Kelman's marketing and testing were not as extensive and thorough as those of other companies and, in fact, it only had about eight salesmen. However, I–T–E was determined to market outdoor oil circuit breakers nationally and it took steps toward that goal. By January of 1958, Kelman was making its first earnest effort to become a national competitor of the principal manufacturers of power circuit breakers, General Electric, Westinghouse, and Allis-Chalmers. It was at this point that I–T–E's competitors attempted to talk with I–T–E employees about Kelman's business.

44. I–T–E was also aware of the vigorous efforts being made by General Electric in 1957 and 1958 to keep Federal Pacific from getting a beachhead in the power switchgear assembly market. Sometime in the summer of 1957, Spencer of I–T–E met in Pittsburgh with Dave Webb of Allis-Chalmers and Wally Payne of Westinghouse to discuss

the extremely low prices Federal Pacific was quoting in its endeavor to enter an already depleted market and General Electric's action in meeting and quoting even lower prices whenever Federal Pacific bid. Sometime thereafter, Spencer met with Rives of General Electric. Rives acknowledged Spencer's observation that it was the policy of General Electric to meet Federal Pacific wherever it quoted business and that "they [General Electric] were not at all interested in having them enter into this business, so they would be meeting them on every bid."

45. Early in 1958, I–T–E was invited to attend meetings with General Electric, Westinghouse and Allis-Chalmers concerning the prices of some types of electrical equipment. Harry L. Buck, an I–T–E Vice President, attended about four such meetings in or about January, February and May 1958, probably at Pittsburgh, Philadelphia and New York. At each of these meetings, Buck was told by George E. Burens, then Vice President and Manager of General Electric's Switchgear and Control Division, that, unless everyone, including I–T–E, agreed to sell at book price levels, General Electric would quote the lowest prices of anybody to every purchaser, every time, every place. When Buck refused to agree to the proposals of other companies at the May meeting, Frank E. Stehlik and Clarence E. Burke, then General Managers of General Electric's High Voltage and Low Voltage Switchgear Departments, who were present for the first time at that meeting, said that General Electric would publish lower prices which would force I–T–E into the pattern General Electric wanted and make it difficult for I–T–E to depart from the price levels General Electric established. Also present at these meetings were Landon Fuller of Westinghouse and L. W. Long of Allis-Chalmers. In addition, J. W. McMullen was present at the first meeting in January and R. L. Bobo of Federal Pacific was present at the meetings other than the first meeting in January. H. F.

Hentschel of General Electric was also present at the May meeting.

46. Some time after Buck attended the January 1958 meetings, Scott wanted to determine the attitude of officials of General Electric, Westinghouse and Allis-Chalmers more highly placed than those with whom Buck had been meeting. For that purpose, Buck asked Fuller whether he might meet with James Jewell or someone else familiar with corporate pricing policy. Fuller said that Jewell was not the man to see since he was concerned with other matters and was no longer significantly concerned with pricing. Fuller suggested that Buck meet with Barry Walker, who was then a staff assistant to A. C. Monteith, the Vice President and General Manager of Westinghouse's Apparatus and Products Division. Buck met Walker in late March or early April 1958 at the Roosevelt Hotel in Pittsburgh. During the course of the conversation, which lasted several hours, Walker said he was familiar with the discussions Buck had been having with Fuller and others and that it was necessary to correct the unreasonably low prices in the switchgear industry. Walker saw absolutely no alternative to immediately raising the prices of switchgear to book on all jobs large and small. He commented upon his own background as assistant to Monteith over a long period of time, during which Monteith had assigned the responsibility for the pricing and sales to him. He also mentioned that, from his own experience in transformers and turbines during the 1954–1955 price war, he was satisfied that the only way to correct the pricing problems of the switchgear industry was a complete and immediate return to book prices. To Buck and to Scott, this conversation clearly implied that any failure on I–T–E's part to do what General Electric, Westinghouse and Allis-Chalmers were seeking could only result in a continuation of the abnormally low price levels then being quoted for switchgear. The threat was enhanced by Walker's clear statement of his position in the Westinghouse hierarchy.

47. Following a meeting of a NEMA statistical committee about March of 1958, Dusch of Federal Pacific was given a group of sheets of past history of the sealed-bid power circuit breaker business by Boyd of Westinghouse who told Dusch that Federal Pacific was getting far too large a share of the sealed-bid business.

48. About April 3, 1958, Scott met with Robert Paxton, then a Vice President of General Electric who within a matter of weeks was elevated to the presidency of that company. During the course of that meeting, Paxton commented on a low bid submitted by I–T–E on isolated phase bus for the St. Lawrence Seaway Project of the New York Power Authority and on the activities of a west coast company which Scott understood to be Kelman, then a subsidiary of I–T–E. Paxton then observed that there had been and might be more trouble with the switchgear prices, that the then current price cutting in switchgear was an indication prices were too high anyway, and that for that reason General Electric had better lower its list prices. Based upon Scott's experience over several decades, there was no doubt in his mind that Paxton's remarks were a threat and a direction to Scott to quote book prices for switchgear or face the prospect of General Electric lowering book prices until I–T–E came into line.

49. In late 1957, early 1958 or the summer of 1958, Fred G. Schmidt, Manager of I–T–E's Switchgear Division, and N. S. Spencer of I–T–E attended a meeting with H. F. Hentschel, General Manager of General Electric's Medium Voltage Switchgear Department, J. T. Thompson, of Westinghouse, and McGuire, of Allis-Chalmers, at the Pittsburgh Airport Motel. General Electric, Westinghouse and Allis-Chalmers were disturbed about I–T–E's pricing of 5 KV and 15 KV power switchgear assemblies and particularly with I–T–E's success in selling 5 KV switchgear assemblies to public utilities. Hentschel told Schmidt that, if I–T–E didn't raise its prices, "the boom would be lowered" on I–T–E, that is, that General Electric would lower its prices to or lower than I–T–E's prices so that I–T–E would not sell a single piece of such switchgear. The I–T–E representatives were told by Hentschel of General Electric that, as long as I–T–E chose to continue to quote low prices, at least General Electric would quote those levels or lower until I–T–E changed its level of quotations and that the General Electric Company could stand quoting at those levels longer than I–T–E could. Others who may have been present were Rives of General Electric and Payne of Westinghouse. Thereafter, General Electric lowered its prices for equipment of this type in a way which presented great difficulties for I–T–E.

50. During the period Burens was general manager of General Electric's Switchgear Division (October 1951 to January 1959), it had a larger portion of the switchgear business than any of its competitors. In the summer of 1958, its share of the market for the switchgear products it manufactured was between 36% and 42%.

51. It was the policy of Burens, general manager of General Electric's Switchgear Division, to be competitive on price. With some variations, General Electric would bid at the lower levels of its competitors to get what it regarded as its share of the business. When a competitor lowered a price, General Electric would quote at that lower level until there was a definite trend up. In other words, it was Burens' policy to follow the competitors' prices down and then follow them up. Burens understood that there was a fine line between predatory pricing and running the competition out of business. He also believed in 1957 and 1958 that General Electric could stand to sell its Switchgear Division products at the prices then existing longer than any of its competitors, including Westinghouse. It was Burens' view in the summer of 1958 that a continuation for another six months of the low price levels for some switchgear products, which were then near costs and sometimes below costs, would result in increased prices "through natural economic forces".

52. During the "white sale" in 1955 and again in 1958, the prices of power switchgear assemblies were below cost and unreasonably low. The price levels in 1955 were far below the levels at which even Allis-Chalmers could survive in the switchgear business and, if they had persisted, Allis-Chalmers would have been forced out of the switchgear business.

53. By the fall of 1958, the Scranton plant of Federal Pacific, which manufactured assembled switchgear, was in "a heavy loss position" and its San Francisco plant, which manufactured a variety of products, including power circuit breakers and power switches, was having "a very difficult time" with sales below cost.

54. On September 11, 1958, Federal Pacific Electric Company submitted a bid to TVA in response to Invitation #2–1274 for several 69 KV, 1500 MVA, 1200 ampere circuit breakers. Although the unit book price was about $20,500, the Federal Pacific bid was $8,990 per unit. On the next day, bids in response to Invitation #2–1125 were opened by TVA for a single circuit breaker of the same rating. On this occasion, General Electric met Federal Pacific's prior bid of $8,990 to the dollar. To I–T–E, this experience reaffirmed its belief that General Electric's studied policy was to be undersold only once and tangibly underscored repeated statements to that effect to I–T–E.

55. About October 6, 1958, Scott had lunch with Burens of General Electric. During the course of that meeting, Burens insisted that there was only one thing to do, and that all the power circuit breaker manufacturers should go back to book prices immediately. He made it quite plain that, unless such action was taken, the existing low price levels would stay where they were. Scott regarded these statements as a threat. During the same discussion, Scott was also much impressed by Burens' remarks that he had conferred with Fuller of Westinghouse about a detailed allocation of $10,000,000 of sealed bid power circuit breaker business in a way which would have been most satisfactory to both of them. To Scott, this was another indication of co-operation between the two largest companies which would make continued resistance to their schemes by the smaller competitors impossible. In this conversation, Burens stated that he was under pressure from General Electric's other division managers who feared their pricing structures would be under attack from customers because of the chaos which then existed in the switchgear and oil circuit breaker markets. This recalled to Scott the similar circumstances of interdivisional pressures within General Electric which resulted in I–T–E being dragged into meetings in the 1930's.

56. Prior to a meeting at the Astor Hotel in New York, on October 8, 1958, which had been arranged by Fisher Black, then Editor of Electrical World and now a utility executive, Scott instructed Buck not to enter into any arrangement with competitors, but only to go there and listen.

57. Prior to the meeting at the Traymore Hotel, Atlantic City, New Jersey, on November 9, 1958, Scott had instructed Buck that he was not to enter into any arrangements with competitors, except as a last desperate expedient. At the meeting, Buck refused for hours and at one point was actually leaving the meeting when he was brought back in by the other persons present. Before the meeting ended, it was clear to Buck that the only choice for I–T–E was to return to pricing some sales of some equipment at book or to face a continuation of the then existing price war with many sales at prices below a level that I–T–E could stand. Even the discussion at that time of the allocation of power circuit breaker sealed bid business showed: First, the intent of the major companies to confine Kelman's sales to Southern California, as had theretofore been done by the 1937 General Electric-Kelman license, by insisting that not more than 2% of Kelman's 4% was to be outside Southern California; and, second, the monolithic nature of the General Electric-Westinghouse combination which reserved to it-

self about 72% without disclosing at that time precisely how it would be divided between them.

58. J. D. Hoffman, of the Hi-Voltage Equipment Co. of Joslyn, attended a meeting in November 1958 at which representatives of Westinghouse (Wilbur Pyle), General Electric, I–T–E and others were present. At the meeting, the Westinghouse representative, in accord with General Electric, said that price cutting had to stop, and that in order to see that it did stop they were going to put into effect discounts of 10% on switches rated below 46 KV, 15% on switches rated from 69 KV through 161 KV, and 20% on the higher voltage ratings. This, they said, would take the desire out of the industry to cut prices anymore. They also said, "Now, if this does not stabilize the market, maybe discounts of 20, 30 and 40 will."

59. At meetings of competitors where prices of power circuit breakers were discussed, Dusch of Federal Pacific, lied about his intentions with respect to the sealed-bid market because of fear of recrimination by competition. More particularly, he was concerned about a price war, similar to the experience he had had, where price cutting took the prices below the direct material and direct labor content of the equipment itself.

60. General Electric had been sensitive for a long time to I–T–E's position as a supplier of components to small switchboard assemblers who compete with the switchgear manufacturers, and in fact one of General Electric's managers had described I–T–E as "long recognized as the 'saviour' of the independents".* In April 1959, Buck attended a meeting at the Penn-Sherwood Hotel in Philadelphia with Burger and Stehlik of General Electric, Fuller of Westinghouse, Bobo and perhaps Benson of Federal Pacific, and Leo Lipscomb of I–T–E. At that meeting Stehlik said that General Electric

had made a study of the profits of the independent switchboard builders, which were estimated to be about 3% and, to minimize their competition, he believed that there should be a 4 or 5 to 7% increase in the prices of large air circuit breakers. It was apparent to Buck that the object of this move was to decrease the switchboard builders' profit, or possibly eliminate it, by increasing the prices of the large air circuit breakers which were a vital and substantial element in the assemblies manufactured by them. This was of paramount importance to I–T–E since it had long been the principal supplier of this product to the independent assemblers. Buck protested that General Electric's analysis was in error and that there was no problem large enough to warrant further consideration. Stehlik was not persuaded.

61. Shortly following the meeting referred to in paragraph 60, F. G. Schmidt attended a meeting at Hot Springs, at which a representative of General Electric proposed an increase in the prices of low voltage circuit breakers of about 15% to 23%.

62. After the meeting at Hot Springs, Schmidt attended two meetings with representatives of General Electric, including Stehlik and Gezon, at which General Electric repeated its proposal to increase the prices of low voltage circuit breakers. Schmidt continued to stall while hoping that the problem would go away. At these meetings the General Electric representatives told Schmidt that, unless I–T–E went along on the proposed increases in the prices of the low voltage circuit breakers, General Electric would reduce the price of the power switchgear assemblies of which the low voltage circuit breakers were components.

63. On August 4, 1959, Stehlik called Buck and told him that General Electric had waited unduly long for an adjustment by I–T–E of the large air circuit

---

* At page 2 of memorandum dated December 28, 1956, and entitled "Sales Plan, Switchboard Builder Market", by R. W. Ayres, Jr., Manager of General Electric's Air Circuit Breaker, Fuse and Accessory Sales. Document No. 218117–32.

breaker prices, which General Electric had urged for months, and that it would wait no longer. In fact, since there had been no change in the circuit breaker prices, Stehlik was sending to his field sales force an announcement of a 10% decrease in the prices of the assembled low voltage metal-enclosed switchgear. Buck was told in that conversation or one later that day that this General Electric action was irreversible.

64. At a meeting on the following day, August 5, 1959, N. S. Spencer, an I–T–E Sales Manager, was told by Houston Jones of General Electric that General Electric had lowered the prices of low voltage switchgear because of I–T–E's refusal to increase low voltage power circuit breaker prices, that General Electric had made this move entirely on its own to narrow the gap between the price levels of the power switchgear assemblies sold by General Electric and the equipment sold by the switchboard builders who bought I–T–E low voltage circuit breakers, that there was no longer room for "Buck's ifs, ands" and that, if I–T–E were to lower low voltage circuit breaker prices to perpetuate the gap, General Electric would lower the assembled prices still further. Notwithstanding these events, I–T–E independently lowered its circuit breaker prices to the assemblers in an effort to relieve them from the pressure created by General Electric's action, which had been designed to minimize their profit margin. Memoranda of N. S. Spencer relating to this and other meetings with competitors where this subject was discussed are in the depository, have been marked as NX1805, 1803, 1804, 1802, 1808J and are identified as 211997, pages 26, 47, 41, 55 and 20. See also 211997–30.

65. The efforts of General Electric and Westinghouse to increase the price at which the low voltage circuit breakers used as components were sold to switchboard builders extended beyond I–T–E to other manufacturers of low voltage circuit breakers, such as Allis-Chalmers.

66. General Electric's concern with and design for the switchboard builder market had existed for several years. In contrast to the pressures sought to be applied to the independent assemblers by General Electric by the 1959 low voltage switchgear price decrease, it has on earlier occasions attempted to dominate the assembler market by increasing its sales of circuit breakers using temporary price cutting as a principal tool. This is demonstrated in the memorandum dated December 28, 1956, by R. W. Ayres, Jr. After a comprehensive analysis, he sets forth General Electric's objective for the switchboard builder market as: "Our goal is to obtain 45% of the available business within a three-year period" (page 10). It is made clear that price competition by small competitors is not to be an obstacle to the success of the General Electric plan. Such action is to be dealt with by an adjustment of prices downward uniformly across the board to all customers but in a way "which will provide the necessary control for return to the proper levels" when General Electric's goal has been reached (page 14).

67. Notwithstanding discussions among competitors at the Traymore meeting referred to in paragraph 57 and at other meetings, I–T–E personnel were instructed to run I–T–E's business their own way. For example, when Buck reported to Scott the proposed 4% allocation of sealed-bid business, Scott told him to forget it and Buck gave similar instructions to his subordinates.

68. At a meeting in Philadelphia in or about September 1959, Buck was told by Stehlik of General Electric and Lewis J. Burger, then General Manager of General Electric's Switchgear and Control Division, that, unless I–T–E agreed to sell power circuit breakers at the same price as General Electric, General Electric would drop its prices to the I–T–E level or lower to force I–T–E into the pattern General Electric thought desirable and that General Electric could continue

to make sales at low prices longer than the smaller companies. Also present at this meeting were Landon Fuller of Westinghouse, Lipscomb of I–T–E and Bobo and Benson of Federal Pacific. The threat was executed within the following weeks and months as the prices began to sag and General Electric announced with respect to some products that it was going to publish a 5% lower price every time the market level moved down. To people acquainted with market practices this could mean only one thing: quote General Electric's published prices or General Electric will drop its prices around your neck until you do.

69. The meetings themselves and procedures at them were used as devices by General Electric and Westinghouse to keep control over the smaller companies such as I–T–E. For example, at meetings in the 1940's, Spencer was told by the representatives of General Electric and Westinghouse the jobs I–T–E could get. Similarly, under "the light-of-the-moon" sheets distributed by Westinghouse in November or December of 1958 and in early 1959, even for periods when I–T–E was in a position to quote low, either General Electric or Westinghouse was to be the next lowest bidder, thus minimizing the significance of I–T–E's low position. Moreover, the lack of significant price differentials between the smaller companies, such as I–T–E, and the largest companies, such as General Electric and Westinghouse, puts the smaller company at a disadvantage with the engineering and purchasing personnel of many buyers who have less incentive to deal with the smaller company. I–T–E deviated from price levels discussed at meetings and quoted lower levels whenever it felt it could get away with it.

70. In the absence of meetings, another technique used by the largest companies, such as General Electric and Westinghouse, which make and sell a large number of different products is, "packaging". Under such a device the multi-product seller gives a single lump-sum quotation for all of its products. If the purchaser requests the item price for a single product, such as a power switchgear assembly, to compare with I–T–E's quotation on that item, the multi-product manufacturer takes it out at a token value which I–T–E cannot meet.

71. W. R. Swoish, of Pennsylvania Transformer, subsequently a division of McGraw-Edison, observed that General Electric was in telephone communication with Westinghouse even when General Electric was not meeting with others. The smaller transformer manufacturers, such as Pennsylvania Transformer, were told by General Electric and Westinghouse what percentage of the sealed-bid business was allocated to them, and what the pricing rules were to be. Swoish attended meetings with General Electric representatives because he was afraid that, if he did not, there would be another "white sale" during which General Electric had reduced the price of equipment involved in these cases below McGraw-Edison's cost of production so that McGraw-Edison either had to withdraw from the market or sell at a loss.

72. Prior to the Philadelphia indictment, George R. Fluehr, President of Kuhlman Electric, a manufacturer of distribution transformers, had received threats from representatives of General Electric to the effect that, if Kuhlman didn't line up, it would be pressured into lining up and this was in connection with Kuhlman's attendance at meetings of competitors.

73. In addition, events and statements since 1959 illustrate and confirm in some respects the position of the major defendants, particularly General Electric, in the years prior to 1960 as it was and as I–T–E believed it to be. Furthermore, they show that General Electric's ultimate pricing policy of enforced uniformity has continued unchanged since I–T–E first learned of it and demonstrate General Electric's power and willingness to employ such a policy. Thus, for example, early in May 1960, following

shortly after an earlier 15 to 20% reduction, General Electric announced a further 5% reduction in the price of medium power transformers, saying that it would continue to lower its prices to meet "market-generated levels" and that a 5% differential between its prices and those of its competitors would bring this change about. (Electrical Newsletter, May 6, 1960.) Adherence to that policy was reflected in an additional 4% decrease which appeared in the press the next month. (Electrical Newsletter, June 17, 1960.)

74. Shortly after D. B. Lawton, General Manager of General Electric's Medium Transformer Department, announced the policy described in paragraph 73, there were trade reports that the same policy was being applied to the sale of General Electric's power capacitors (compare Electrical Newsletter issue of May 6 with those of May 13 and July 15, 1960) and large power transformers (Electrical Newsletter, September 2, 1960).

75. What has happened in the pricing of power capacitors illustrates the application and effect of General Electric's pricing policy. Since the summer of 1960, the manufacturers of power capacitors other than General Electric have made numerous independent efforts to obtain what they regarded as a fair price level for their products, which according to the press reports appeared to have been about $117 or $120 for a 50 kvar unit. After a January 1960 price reduction of 5%, General Electric announced slight increases in July, September and early December 1960 which would have brought the price to $108 effective December 12, 1960. Effective December 22, 1960, however, in obvious retaliation against the entire industry because of reported isolated price deviations in four states, it reduced its price across the nation to $100. General Electric's intolerance of any price deviation was further reflected on March 1, 1961, when, at a time its competitors were increasing their book prices to $117, General Electric reduced its price not only for the

future orders but for all orders on its books to $97.33, again allegedly because of the prices on five sales to utilities covering a period of weeks. (Electrical Newsletter, January 1, 1960, July 8, and 15, 1960, September 2, 1960, December 16, 23 and 30, 1960, March 3, and 10, 1961.) It appeared that the market level which had been established by General Electric was well below cost, which was said by some manufacturers to be about $103. (Electrical Newsletter, September 23, 1960.)

76. In the summer of 1960, George R. Fink, then an employee of General Electric's Switchgear Division, told Joseph Chapman, a stockbroker who Fink knew was also an I–T–E director, that low prices for electrical equipment would not last too long, that General Electric had taken corrective action, and that this action had been reported in Electrical World, giving the page reference. Chapman repeated the message to Scott. When Scott looked at Electrical World he found only a notice that General Electric had announced a 40% decrease in the catalogue prices of some oil circuit breakers and other decreases for some products of General Electric's Switchgear Division. (See page 60, Electrical World, August 8, 1960.) When Chapman called Fink and said that the article referred only to a big price cut, Fink said that it was the first step toward raising prices. Chapman said he did not understand and Fink then said, "Your friends up at 19th and Hamilton can read between the lines", or words of like effect. I–T–E's principal plant and executive offices are at 19th and Hamilton Streets, Philadelphia.

77. Starting about 1960, Westinghouse carried out a predatory pricing policy which resulted in the establishment of prices below cost for the purpose of eliminating competition in steam surface condensers. The prices so established by Westinghouse were frequently 10% below the bare shop manufacturing costs of Westinghouse's competitors without giving any effect to commercial costs or overhead costs. Westinghouse

increased its percentage of the business from 20% to about 50% in two years' time.

78. In the spring of 1961, General Electric tried to obtain a price increase of 3% on bus and switch insulators which, inasmuch as such insulators are components of power switching equipment, would have the effect of further squeezing the independent power switching equipment manufacturer by raising his costs. (Electrical Newsletter, March 31 and April 7, 1961.) I–T–E, as a manufacturer of power switching equipment, purchases some bus and switch insulators, which it does not make itself, and was notified of General Electric's price increase on those items by letter dated March 17, 1961, and by oral statements on March 20 and April 4, 1961, to J. O. Knott, the Purchasing Agent of I–T–E's Greensburg Division, from C. B. Vaughn, Manager-Marketing of General Electric's Insulator Department, and D. P. Lacock, General Electric's Pittsburgh District Manager. The General Electric representatives, who knew that I–T–E also manufactures insulators, made three points: (1) If General Electric's price increase was not followed, General Electric would probably cut its prices and "a price war would follow"; (2) "General Electric was determined to increase their share of the market and if necessary would slash prices to accomplish this"; and (3) General Electric places a considerable amount of business with I–T–E and therefore General Electric should be given consideration by I–T–E in its purchases of insulators. Knott prepared a memorandum dated April 4, 1961.

79. All these events are to be evaluated in the light of public statements of company policy made by General Electric's Chairman, Ralph Cordiner. He has said that he has measured the propriety of any given price by the effect that such a price has upon General Electric's share of the market, noting, on occasion, that General Electric's failure to secure what it regards as an adequate volume of business is an indication that prices may be too high. (*Electrical Newsletter,* December 9, 1960.) In his testimony before the Senate Antitrust Subcommittee, he made it plain to all his competitors that General Electric's policy did not tolerate any price 'deviation, saying, " * * * whenever you do a stunt like that [deviate from book price], you establish a new national price." NX1631, at page 17755. This is an explicit statement of General Electric's pricing policy: General Electric's "national price level" for every sale, every place, is the lowest bid of any competitor, any time, any place. The alternatives to the small companies have been either to follow General Electric's price or face the crippling of their businesses.

80. Among the other considerations taken into account by I–T–E in weighing the statements and acts of its larger competitors were their size and how that size had been obtained. Using 1958 as illustrative, General Electric's net sales exceeded $4,120,000,000 and Westinghouse's net sales exceeded $1,895,000,000. In contrast, I–T–E's 1958 sales were less than 3% of General Electric's. Furthermore, the economic power of the two largest companies is measured not merely by the sales figures but by the diversity of their activities. General Electric is involved in about 13 of the nation's 21 basic major industries. General Electric has four main product groups. Using 1958 figures as illustrative, consumer products accounted for 26% of its sales; industrial components and materials, 26%; defense sales, 24%; and 24% from heavy capital goods, which includes not only electric generation, distribution, and transmission equipment for utilities but other heavy goods for industry such as locomotives. (*General Electric 1958 Annual Report,* page 5.) The Westinghouse situation is roughly comparable. For 1959, its net sales by product groups were: Apparatus and general products, 54%; consumer products, 28%; and atomic and defense products, 18%. (*Westinghouse 1960 Annual Report,* page 7.)

81. General Electric's ability to subsidize from sales in other lines the low sale prices of any or all of the products involved in these and related cases is demonstrated by the fact that all of the products subject to antitrust cases amounted to only 10% or less of General Electric's total business.

82. With respect to the manner of growth of the larger companies, I–T–E was very much aware that, particularly in earlier years, it was in large part due to the acquisition by the larger companies of many of their smaller competitors. Scott knew not only about the earlier Cutter and I–T–E experience previously referred to but of the experience of others including General Electric's purchase of Trumbull, a significant panelboard and switchboard manufacturer, and a substantial interest in Pacific Electric, a leading west coast manufacturer of circuit breakers. In fact, at some point in the 1930's, Scott was told by General Electric's Paul Turk, who had investigated the Pacific Electric operation before General Electric acquired an interest in it, that he did not recommend the acquisition from a purely financial view and that General Electric's desire to purchase a dominant position in the west coast circuit breaker market was decisive.

83. It can be said that the coercive threats and acts of the larger companies, and particularly General Electric, were directed to two objectives: First, the achievement of uniform prices and, second, the containment of smaller competitors. It was necessary from the point of view of the three major companies to have price uniformity for each product manufactured by a smaller, short-line company so that there would be no adverse customer reaction to uniform prices in the heavier product lines, which were more fully occupied by the major companies, and from which a more significant portion of their revenues was obtained. A second benefit of price uniformity was the elimination of factors leading to price wars. The third, and perhaps most important, benefit of price uniformity to a large company was the denial to a smaller company, organizationally less rigid, of the competitive advantage of flexible pricing in the marketing of its products.

84. There are many variables which go into the businessman's determination of the price he will charge for a specific transaction. Included among them is his estimate of the prices which his competitors will bid, and, of course, his knowledge of or beliefs concerning his competitors' past pricing will be significant factors in formulating his estimate of his competitors' future conduct. However, General Electric's policy of a "national price level" for every sale, every place at the lowest bid of any competitor, any time, any place went beyond the requirements of fair competition for any single sale since that policy has as a substantial purpose the establishment of a uniform price and the elimination of price competition on succeeding transactions.

85. As a result of the threats and acts referred to above, officers and employees of I–T–E attended and participated in meetings relating to the pricing and allocation of sales of some types of power switchgear assemblies and some other types of electrical equipment, which meetings have been identified in this written statement, by officers and employees of I–T–E in the course of discovery proceedings in this and other pending litigation, and in papers filed in such litigation such as answers to complaints, answers to interrogatories and briefs and memoranda. However, I–T–E's participation in such pricing discussions permitted it to continue as an effective competitor over the years and to pursue its policy of competition in price and other respects to an extent which would not otherwise have been possible in the face of the economic power arrayed against it and the limitations imposed upon it by the events referred to above. Thus, prices for electrical equipment of the types manufactured by I–T–E have been more favorable to purchasers than they would have been had I–T–E followed any other course.

III.

*National Depositions:*

| Deponent and Present or Former Employer | Date | Pages |
|---|---|---|
| W. M. Scott, Jr. I–T–E | 5/27–28/64 | N33664–5, N33672–5, N33698, N33703–4, N33712–7, N33726–7, N33731–3, N33746, N33825–30, N33833–5, N33855–9, N33890–3 |
| | | NX1865, pages 17494, 17498–503, 17508, 17511–2, 1751515, 17518 |
| H. L. Buck I–T–E | 5/28/64 | printed pages 14–7, 20–32, 47–64, 67–8, 70–78, 91–2, 94, 102, 104–10, 113 |
| F. G. Schmidt I–T–E | 5/22/64 | N33256–9, N33270–1, N33277–87, N33337–8 |
| N. S. Spencer I–T–E | 5/14–19/64 | N32214–7, N32225–8, N32236–46, N32249, N32274–5, N32343–5, N32499–501, N32511–2, N32598–610, N32630–2 |
| | | NX1781, 1782, 1783, 1803, 1804, 1806, 1808J |
| R. F. Schall I–T–E | 3/5/63 | printed pages 22, 69 |
| C. E. Burke GE | 11/27–28/63 9/20/63 | N4842–4, N4885–9 N20788–94 |
| | | NX1083, pages 3–7 |
| G. E. Burens GE | 9/9–11/63 | N19453–4, N19489, N19643–6, N19660–4, N19691–2, N19772–3, N19779–80, N19815–21, N19826–55 |
| J. W. McMullen Allis-Chalmers | 3/16–19/64 | N30451–2, N30460–1, N30456–7, N30462, N29970–1, N30136–44 |
| J. D. Hoffman Joslyn | 10/21/63 | N22744–5, N22712–5, N22734–5 |
| W. S. Ginn GE | 11/29–30/62 | N5479–80, N5483–90 |
| J. W. Seaman GE | 9/4–6/63 | N19187–8, N19306, N19308, N19126–7 |
| | | NX1059F & G |

| Deponent and Present or Former Employer | Date | Pages |
|---|---|---|
| R. W. Smith GE | 9/16–17/63 | N20200–1, N20186–8 |
| R. J. Cordiner GE | 3/9–12/64 | N29493–5, N29549, N29559–60, N29560–8 NX1609, NX1631, pages 17755, 17673 |
| W. R. Swoish McGraw Edison | 8/19–20/63 | N18193, N18152–4, N18162, N18224–5, N18165–70, N18399–401, N18088–93 |
| L. W. Long Allis-Chalmers | 9/19–20/63 | N20371–5, N20571–4, N20601, N20484–7, N20512–5 |
| L. B. Gezon GE | 5/25/64 | N33495–9, N33524 |
| H. F. Hentschel GE | 5/20/64 | N3781–91; NX1830 |
| F. M. Nolan Allis-Chalmers | 5/29/62 | printed page 4 |
| J. V. McGuire Allis-Chalmers | 6/5/64 | N34749–51 |
| G. A. Dusch Federal Pacific | 6/24–26/63 | N15747–9, N15532–4, N15544–7, N15527 |
| F. H. Roby Federal Pacific | 6/26/52 | printed pages 22, 13 |
| W. M. Wood Schwager-Wood | 5/5 and 7/64 | N31228–31, N31245–6, N31649–50, N31659–61 |
| Perry M. Green, Jr. Kuhlman | 11/17/64 | N35819–20, N35815–6 |
| F. E. Stehlik GE | 5/19/64 | N32729–30, N32731–4, N32752 |
| W. A. Wirene GE | 9/4–5/63 | 2N3219–51, 2N3255–63 |
| W. H. Feldmann Worthington | 2/11/65 | 2N10912–4 |
| Frank Mason H. K. Porter | 2/12/65 | 8N1382–6, 8N1389–90 8NX90, 91, 92 |

## IV.

*Documents in addition to those identified above:*

1. A letter dated August 1, 1933, related to Westinghouse—I–T–E patent licenses of the same date.

2. A memorandum of a meeting attended by W. M. Scott, Jr., on March 23, 1933.

3. "Men and Volts, The Story of the General Electric" by J. W. Hammond, 1941, J. B. Lippincott Company, especially page 272.

4. One of the Cutter stock certificates evidencing the General Electric and Westinghouse interests in Cutter.

5. Hearings before the Subcommittee on Antitrust and Monopoly, of the Senate Committee on the Judiciary, 87th Congress, First Session, Parts 27 and 28.

6. Patent license between Kelman and General Electric entered into as of November 20, 1937, and papers relating thereto bearing numbers 61006–83.

7. Letters from Newton to Scott dated May 1, 1931 and Scott to Newton dated May 13, 1931, which relate to the air circuit breaker discussions with competitors.

8. Thurman Arnold's letter to Scott, Jr., dated May 9, 1940.

9. Spencer's notes as follows:
 211997-24 to -29
 211997-39 to -43
 211997-44 to -49
 211997-50 to -61
 211997-95 to -100
 211997-143 to -151
 211997-137 to -142
 211997-152 to -153

10. Annual Reports of the General Electric Company for such period as may be available, including but not limited to 1956 to 1960 inclusive.

11. Annual Reports of Westinghouse Electric Corporation for such period as may be available, including but not limited to 1956 to 1960.

12. Annual Reports of Allis-Chalmers Manufacturing Company for such period as may be available, including but not limited to 1956 to 1960.

13. Letters from Victor S. Beam to William Scott, dated April 24, 1933 and August 7, 1933.

14. Letter dated June 23, 1932 to A. Edward Newton from W. M. Scott.

15. Papers relating to the "60–40" agreement between General Electric and Westinghouse referred to by W. M. Scott, Jr., in his deposition on May 27–28, 1964.

16. The works of T. K. Quinn, including: "Giant Business, Threat to Democracy", Exposition Press Inc., 1953; "Unconscious Public Enemies", The Citadel Press, 1962; "Giant Corporations, Challenge to Freedom", Exposition Press Inc., 1956.

17. Letter dated November 13, 1962 from W. M. Scott, Jr., to Lee Loevinger and Mr. Loevinger's reply of November 19, 1962.

## V.

*Potential trial witnesses:*

| Potential Witness and Present or Former Employer | Description of Possible Testimony by Reference to Paragraphs of Part II of This Statement |
|---|---|
| W. M. Scott, Jr.<br>I-T-E | All |
| H. L. Buck<br>I-T-E | 1–3, 42–45, 54, 56, 57, 60–70, 73–76, 78, 83–85 |
| F. G. Schmidt<br>I-T-E | 1–3, 44, 49, 60–66, 69, 70, 83–85 |
| N. S. Spencer<br>I-T-E | 1–3, 44, 49, 60–64, 69, 70, 83–85 |
| R. F. Schall<br>I-T-E | 1–3 43, 67, 83–85 |
| C. E. Burke<br>GE | 1–3, 45, 51, 55, 79, 83–85 |
| G. E. Burens<br>GE | 1–3, 30, 34, 36, 37, 45, 50, 51, 55, 57, 66, 79, 80, 83, 84 |
| J. W. McMullen<br>Allis-Chalmers | 1–3, 43, 45, 55, 83, 84 |
| J. D. Hoffman<br>Joslyn | 1–3, 58, 83, 84 |
| W. S. Ginn<br>GE | 1–3, 36, 79, 83, 84 |
| J. W. Seaman<br>GE | 1–3, 36, 79, 83, 84 |
| R. W. Smith<br>GE | 1–3, 36, 55, 79, 83, 84 |
| R. J. Cordiner<br>GE | 1–3, 79, 80, 81, 83, 84 |
| W. R. Swoish<br>McGraw-Edison | 1–3, 6–8, 14–25, 71, 83, 84 |
| L. W. Long<br>Allis-Chalmers | 1–3, 27, 45, 65, 83, 84 |
| L. B. Gezon<br>GE | 1–3, 62, 83, 84 |
| H. F. Hentschel<br>GE | 1–3, 6–8, 14–25, 45, 83, 84 |
| F. M. Nolan<br>Allis-Chalmers | 1–3, 52, 83, 84 |
| J. V. McGuire<br>Allis-Chalmers | 1–3, 52, 83, 84 |

| Potential Witness and Present or Former Employer | Description of Possible Testimony by Reference to Paragraphs of Part II of This Statement |
|---|---|
| G. A. Dusch<br>Federal Pacific | 1–3, 47, 53, 59, 83, 84 |
| F. H. Roby<br>Federal Pacific | 1–3, 53, 83, 84 |
| W. M. Wood<br>Schwager-Wood | 1–3, 31, 58, 83, 84 |
| Perry M. Green, Jr.<br>Kuhlman | 1–3, 72, 83, 84 |
| F. E. Stehlik<br>GE | 1–3, 45, 60–64, 83, 84 |
| W. A. Wirene<br>GE | 1–3, 17–20, 83, 84 |
| W. H. Feldmann<br>Worthington | 1–3, 77, 83, 84 |
| Frank Mason<br>H. K. Porter | 1–3, 78, 83, 84 |
| George R. Fluehr<br>Kuhlman | 1–3, 72, 83, 84 |
| J. O. Knott<br>I-T-E | 1–3, 78, 83, 84 |
| Joseph Chapman<br>C. C. Collings & Co. | 1–3, 76, 83, 84 |

## VI.

I–T–E has attempted to comply in good faith with Local Pretrial Order No. 4. To the extent that it may have been unable to do so in every respect, the reasons for any such failure include:

1. There was insufficient time for a task of such magnitude, particularly when considered in connection with the other obligations of counsel in these cases to comply with other requirements of local pretrial orders.

2. By its terms, paragraph 3(D) (xv) requires the identification of portions of all national depositions "which relate to or bear on" I–T–E's Fourth Defense. To date, there have been at least 60,-000 pages of such depositions and it is quite possible that portions other than those heretofore identified in this statement relate to or bear on I–T–E's Fourth Defense. I–T–E's inability has been further aggravated by the refusal of General Electric, Westinghouse and Allis-Chalmers to sell it copies of national depositions taken on behalf of defendants.

3. By its terms, paragraph 3(D) (xvi) requires the identification and full description of the contents of "all documents produced in a national document depository which relate to, bear on or reflect" I–T–E's Fourth Defense.

There are hundreds of thousands of documents in the defendants' depository. Most of them were deposited by other defendants and are not available to I–T–E as a matter of right. There are thousands of documents in the plaintiffs' national depository and I–T–E has seen only those deposited by some of the plaintiffs in these Chicago cases.

4. By its terms, paragraphs 3(D) (xviii) and (xix) require the identification and full description of the contents of all documents and the setting forth of all other facts and contentions "which relate to, bear on or reflect" I–T–E's Fourth Defense. Limitations of time, space and human ability preclude literal compliance beyond what has been done. For example, this statement does not identify documents filed in this and other pending litigation such as answers to complaints, answers to interrogatories and briefs and memoranda.

5. Until I–T–E's discovery program, which includes matters related to I–T–E's Fourth Defense, is complete, I–T–E cannot make a more definite response to Local Pretrial Order No. 4.

Dated: March 9, 1965

Owen Rall
Elroy C. Sandquist, Jr.
Peter M. Sfikas
135 South LaSalle Street
Chicago, Illinois 60603
Attorneys for Defendant
I-T-E Circuit Breaker Company

## APPENDIX B

### AMENDED WRITTEN STATEMENT OF DEFENDANT I–T–E CIRCUIT BREAKER COMPANY AS REQUIRED BY LOCAL PRETRIAL ORDER NO. 4

Pursuant to the oral direction of the Court on March 22, 1965, defendant I–T–E Circuit Breaker Company amends its written statement filed on March 9, 1965, in the following respects and, except as otherwise stated herein, adopts and incorporates its written statement heretofore filed:

A. *Amends paragraph II.8. by adding at the end of it:*

As a result of the coercive activities of General Electric and Westinghouse, I–T–E did change its terms for freight to "f.o.b., Philadelphia, freight allowed."

Because of the insistence of General Electric and Westinghouse, I–T–E did revise its terms for cash discount so as to eliminate that variation in its initial bid or quotation.

B. *Amends paragraph II.23. by adding at the end of it:*

As a result of these demands of General Electric and Westinghouse and I–T–E's fear that failure on the part of I–T–E to comply would bring retaliation, T–T–E stalled by saying that it would comply with the demands and it sometimes but not always did com-

ply. At that period of time, in the late 1930's, I–T–E made relatively few sales of this type of equipment and the effect of these demands and I–T–E's partial compliance with them, in effect, caused I–T–E to withdraw from the market.

C. *Amends paragraphs II.45. and II.48. by adding at the end of each of them:*

I–T–E undertook no conduct as the result of the events set forth in this paragraph, in themselves, except in the sense that such events were part of the entire context leading to I–T–E's belief that it had no choice but to participate in meetings and discussions with General Electric, Westinghouse and Allis-Chalmers.

D. *Amends paragraph II.57. by adding at the end of it:*

Following the Traymore meeting, I–T–E personnel were instructed to run I–T–E's business their own way. See paragraph 67. But as a result of the threats and acts at the Traymore meeting and the events preceding it, employees of I–T–E did attend and participate in meetings at which the pricing and allocation of sales of some types of power switchgear assemblies and some other types of electrical equipment were discussed. At some of these meetings, I–T–E employees discussed not only so-called "book" or catalogue prices but also prices for equipment which had been or was to be sold to particular customers.

———————

I–T–E has done its best to comply with Local Pretrial Order No. 4, notwithstanding its objections to it, which have been heretofore expressed, and its belief that the nature and extent of the factual material upon which I–T–E relies make it impossible, as a practical matter, to do more than it has done. It respectfully suggests that it has substantially, if not literally, complied with the Court's order.

(s)
Owen Rall
Elroy C. Sandquist, Jr.
Peter M. Sfikas

135 South LaSalle Street
Chicago, Illinois 60603

Attorneys for Defendant
Dated: April 5, 1965. I-T-E Circuit Breaker Company

———◆———

## PLAINTIFFS' STATEMENT PURSUANT TO PARAGRAPH (4) OF LOCAL PRETRIAL ORDER NO. 4

### I. INTRODUCTION

Of the approximately twenty-eight manufacturers convicted of antitrust violations in the Philadelphia criminal cases, I–T–E Circuit Breaker Company ("I–T–E") alone seeks judicial absolution from treble-damage liability on the alleged ground that it participated in the illegal conspiracies because it was "coerced" by larger competitors. In support of this alleged defense, I–T–E has offered nothing but a jumbled mass of jabberwocky.

The tone to I–T–E's apologia for decades of illegal price-fixing and market allocation is fixed at the outset—"seemingly colorless incidents," we are told, must be viewed in light of the significance they have "to a person who has grown up in the industry." (First Statement, p. 2) I–T–E then takes its own caveat as a license to deal in vague generalities and accusations.

Before examining I–T–E's statement in detail, it is important to place the "coercion defense" in perspective by examining what I–T–E has conveniently ignored:

Part II – I–T–E's Growth Under the Protective Umbrellas of the Conspiracies;

Part III – The Personal Profit to Those Who Directed I–T–E in Its Illegal Course of Action;

Part IV – I–T–E's Failure For at Least Twenty-Eight Years to Expose the Conspiracies.

Plaintiffs do not in this Statement set forth all of the conspiratorial evidence relating to all of the product lines in which I–T–E was involved, even though it would be appropriate to do so if the "coercion" issue remains at the time of trial. However, because I–T–E generally fails to identify products in the course of its Statements, and I–T–E's conspiratorial activities expanded along with its expansion in the electrical equipment field, we point out that I–T–E participated in illegal conspiracies involving nine product lines:

Power switchgear assemblies

Power switching equipment

Large circuit breakers (rated in excess of 1,500 volts)

Low voltage power circuit breakers

Low voltage distribution equipment

Insulators

Isolated phase bus

Navy and marine switchgear

Open fuse cutouts

## II. I–T–E'S GROWTH UNDER THE PROTECTIVE UMBRELLAS OF THE CONSPIRACIES

1. W. M. Scott, Jr. (Max Scott) admitted that he attended price-fixing meetings with competitors at least as early as 1931. (Deposition, p. 3)*

2. As of December 12, 1931, I–T–E's net assets were $1,074,692.14. (I–T–E financial statement dated 12/16/31.)

3. When I–T–E first conspired with competitors in 1931, it manufactured basically two types of products—circuit breakers of 600 volts or less (usually referred to by I–T–E as "large air circuit breakers" and more commonly referred to as "low voltage power circuit breakers") and switchboards, which undoubtedly represent a small portion of its present business.

4. Since 1931, I–T–E has grown into a multi-product, multi-million dollar corporation and consistently joined the price-fixing and market allocation conspiracies affecting its "electrical equipment" products.

5. *If* there were any merit to I–T–E's allegations of coercion, the necessary conclusion is that I–T–E voluntarily expanded its business knowing beforehand that a necessary concomitant of expansion was further violation of the antitrust laws.

6. Quite apart from whether there is *any* merit to a "coercion defense" under some circumstance, it is clear that the defense cannot be sustained where, as here, a corporation undertakes business activity for profit knowing beforehand that it has to and will violate the antitrust laws.

---

* Unless otherwise indicated, citations to "Deposition" are to National Depositions and to printed page numbers.

7. When I–T–E changed from a New Jersey to a Pennsylvania corporation in 1939, its capital structure consisted of 9,640 shares of common stock, which were owned as follows:

| | |
|---|---:|
| W. M. Scott | 14 |
| W. M. Scott, Jr. | 1,144 |
| A. Clifford Campion, Jr. | 1,000 |
| R. E. Murphy | 40 |
| By or for other members of Scott family | 4,384 |
| E. Swift Newton | 2,488 |
| A. Edward Newton | 2 |
| By or for other members of Campion family | 420 |
| Others | 148 |
| Total | 9,640 |

(Minutes of Shareholders meeting of 12/22/39.)

———◆———

8. I–T–E was theretofore and continued to be owned primarily by three families—the Scotts, Newtons, and Campions.

9. *At least* the Scotts, Newtons, and R. E. Murphy participated in or knew of the price-fixing meetings with competitors. (Scott Deposition, p. 4; Letter from Mr. Scott, Sr. to A. Edward Newton, dated 5/13/31.)

10. Attached as Exhibit A and Exhibit B, respectively, are "ten year statistical reviews" from I–T–E's annual reports for 1964 and 1956. I–T–E's net worth in 1959 was $46,479,263.

11. I–T–E's total net worth, common shares outstanding and net worth per share (for some years prior to those shown on Exhibits A and B and adjusted to reflect a 2 for 1 dividend in 1946 and a 5 for 1 split on August 1, 1947), were as follows:

| | Total Net Worth | Common | Net Worth Per Share |
|---|---|---|---|
| 1946 | $3,949,617 | 28,920 | $136.56 |
| 1945 | 3,794,595 | 28,920 | 131.21 |
| 1944 | 4,083,926** | 28,920 | 141.21 |
| 1943 | 3,756,110 | 28,920 | 129.88 |
| 1942 | 3,215,731 | 28,920 | 111.19 |
| 1941 | 2,650,138 | 28,920 | 91.62 |

** (apparently estimated)

12. I–T–E's growth has been achieved with relatively minor "outside" financing:

(a) In October, 1951, I–T–E issued 60,000 shares of $50 par value, 4½% convertible preferred stock, all of which was converted by the end of 1953.

(b) In April, 1954, I–T–E issued 100,000 shares of $50 par value, 4.6% preferred stock, of which 60,662 shares were still outstanding at the end of 1964.

(c) In March, 1957, I–T–E issued $10,000,000 of 4¼% Convertible Subordinated Debentures, of which $9,537,000 remained outstanding at the end of 1964.

13. I–T–E made the following major acquisitions, for I–T–E stock, within the periods of the illegal conspiracies:

| | | I–T–E Stock | |
|---|---|---|---|
| Nov., 1947 – Railway & Industrial Engineering Company | | 122,952 | shares* |
| Dec., 1953 – Victor Insulators, Inc. | | 53,900 | shares |
| June, 1954 – BullDog Electric Products Company | | 227,272 | shares |
| Aug., 1956 – The Kelman Elec. & Mfg. Co. | | 97,300 | shares |
| Dec., 1956 – The Walker Electrical Co. | | 51,100 | shares |
| 1958 – Canadian Porcelain Co., Ltd. | | 18,820 | shares |
| 1958 – Wilson Electrical Equip. Co. | | 8,820 | shares |
| | Total | 580,164 | shares |

*(Adjusted for 2–1 split in 1953 above years.) (Annual Reports of I–T–E for

14. (a) I–T–E's expansion and acquisitions were voluntarily undertaken despite its alleged knowledge that it would be subjected to coercion by larger competitors in new product lines.

(b) Thus, I–T–E acquired Railway & Industrial Engineering Company in 1947 and then participated in the power switching equipment conspiracy. Prior to the time I–T–E acquired this company, I–T–E had knowledge that R&IE and others were defendants in a government proceeding alleging illegal price-fixing which ultimately resulted in a consent decree against R&IE and others. (Local Exhibit P–13.)

(c) In 1953, I–T–E acquired Victor Insulators, Inc. and then participated in the insulator conspiracy.

(d) In 1956, I–T–E acquired The Kelman Electric & Manufacturing Company and subsequently participated in the large circuit breaker conspiracy.

15. (a) I–T–E also acquired two manufacturers of low voltage distribution equipment—BullDog Electric Prod-ucts Company of Detroit in 1954 and The Walker Electrical Company in 1956.

(b) Prior to the acquisition by I–T–E, BullDog had not participated in the price-fixing conspiracy, although it had been invited to "join the club," according to Mr. William H. Frank. (Local Deposition, pp. 6–17) Walker did participate in the conspiracy prior to the acquisition. The products of both companies were involved in the conspiracy after I–T–E acquired them.

(c) According to counsel for I–T–E, I–T–E has not yet raised its alleged coercion defense in any low voltage distribution equipment case, even though its two coercion statements make no distinction among products in the coercion to which it allegedly was subjected.

III. THE PERSONAL PROFIT TO THOSE WHO DIRECTED I–T–E IN ITS ILLEGAL COURSE OF ACTION

16. The "coercion" issue is important, if at all, only if plaintiffs establish

that they were overcharged on equipment purchased from I–T–E as a result of I–T–E's participation in a conspiracy which violated Section 1 of the Sherman Act. I–T–E claims that it ought to be allowed to keep the overcharges if it can establish that its participation in the illegal conspiracies was the result of "coercion" by larger competitors. We believe that no equitable or legal principle could possibly sanction such a result and that the issue of "coercion" is irrelevant as a matter of law. Nevertheless, assuming *arguendo* some relevancy for the coercion issue, plaintiffs submit that the personal profit to those who directed I–T–E in its participation in the illegal conspiracies is important in two respects:

(a) First, it is relevant to whether these individuals acted because of "coercion" or because they personally profited by their action; and

(b) Secondly, it is relevant to the consideration of whether a "coercion defense" should in any event be applied where, as here, the result would be to allow those who caused I–T–E to violate the antitrust laws to retain the fruits of their illegal activity.

17. (a) As a result of stock splits and stock dividends, the 9,640 shares of I–T–E stock outstanding in 1939 and 1940 have increased as follows:

| | | |
|---|---|---|
| 1940 | – 9,640 | |
| 1946 | – 28,920 | (stock dividend of 2 shares for 1) |
| 8/1/47 | – 144,600 | (5 for 1 split) |
| 9/15/47 | – 151,830 | (5% stock dividend) |
| 4/14/49 | – 172,074 | (dividend of 1 share for each 7½ shares) |
| 1950 | – 189,281 | (10% stock dividend) |
| 1952 | – 198,745 | (5% stock dividend) |
| 1953 | – 397,490 | (2 for 1 split) |
| | 417,364 | (5% stock dividend) |
| 1956 | – 434,058 | (4% stock dividend) |
| 1957 | – 442,739 | (2% stock dividend) |
| 1958–1964 | – 442,739 | |

18. Of the 1,286,684 shares of I–T–E outstanding from 1959 through 1964, the portion represented by the original 9,640 shares (that is, 442,739 shares) is slightly in excess of 34%.

19. Each of the original 9,640 shares would equal in excess of 45 shares in the 1959 through 1964 period.

20. In contrast to the net worth of $1,074,692 in 1931, the interest represented by the original shares increased in net worth as follows:

| | Per Share | Shares | Total |
|---|---|---|---|
| 1947 | $16.82 | 151,830 | $ 2,553,780.60 |
| 1949 | 20.63 | 172,074 | 3,549,886.62 |
| 1950 | 21.35 | 189,281 | 4,041,149.35 |
| 1952 | 25.69 | 198,745 | 5,105,759.05 |
| 1953 | 25.39 | 417,364 | 10,596,871.96 |
| 1956 | 28.48 | 434,058 | 12,361,971.84 |
| 1957 | 31.65 | 442,739 | 14,012,689.35 |
| 1958 | 32.69 | 442,739 | 14,473,137.91 |
| 1959 | 32.92 | 442,739 | 14,574,967.88 |
| 1960 | 31.60 | 442,739 | 13,990,552.40 |

21. Dividends which have been paid to the original interests, just in the period starting in 1946, can be estimated as follows:

| | Div. per Share | Shares of Orig. Int. | Total |
|---|---|---|---|
| 1946 | 1.33⅓ | 28,920 | $ 38,560.00 |
| 1947 | .40 | 151,830 | 60,732.00 |
| 1948 | .55 | 151,830 | 83,506.50 |
| 1949 | .60 | 172,074 | 103,244.40 |
| 1950 | .60 | 189,281 | 113,568.60 |
| 1951 | .77½ | 189,281 | 146,692.78 |
| 1952 | 1.06¼ | 198,745 | 211,166.56 |
| 1953 | 1.21⅞ | 417,364 | 508,662.38 |
| 1954 | 1.25 | 417,364 | 521,705.00 |
| 1955 | .81¼ | 417,364 | 339,108.25 |
| 1956 | 1.07½ | 434,058 | 466,612.35 |
| 1957 | 1.62½ | 442,739 | 719,450.88 |
| 1958 | 1.80 | 442,739 | 796.930.20 |
| 1959 | 1.80 | | 796.930.20 |
| 1960 | 1.00 | 442,739 | 442,739.00 |
| | | 442,739 | |
| | | Total | $5,349,609.10 |

22. The Scott family interests represented approximately 57% of the original 9,640 shares (5,542 out of 9,640) and the total dividends attributable to those interests in the 1946 through 1960 period were $3,049,277.

23. The foregoing figures substantially understate the total gain to all of the persons who directed I–T–E in its illegal course of action since major owners in at least three of the acquired companies (Railway & Industrial Engineering Company, Victor Insulators, Inc., and The Walker Electrical Co.) participated in the conspiracies both before and after acquisition by I–T–E.

24. In addition to salaries, bonuses, and other benefits received by conspirators employed by I–T–E, there has been the further benefit of the substantial increase in value in ownership in I–T–E. For example, in contrast to a total net worth for the Company in 1931 of $1,074,692.14, the net worth of the proportion of the original shares owned by or for members of the Scott family had a net worth in 1959 of $8,209,918.

(Of the 9,640 shares outstanding in 1939, the Scott family owned 5,542. Converted at the rate of 45 shares to 1—see paragraph 19 above, the 5,542 shares would equal 249,390 shares in 1959. The stated net worth per share in 1959 was $32.92.) (It is clear from the I–T–E Proxy Statement dated March 17, 1960, that at least 244,350 shares were owned by or held in trust for members of the Scott family, excluding children and grandchildren of Max Scott who might own 10,000 to 15,000 shares. Scott Deposition, p. 111.)

25. While the pattern of stock ownership cannot be traced for every person who directed I–T–E in its illegal course of action, it is clear that they personally benefited from directing I–T–E's participation in the conspiracies:

(a) For example, the net worth per share of I–T–E stock in 1947, the year I–T–E acquired the Railway & Industrial Engineering Co. which manufactures power switching equipment, was $16.82. The net worth per share in 1959 was $32.92.

(b) The net worth per share in 1956, the year I–T–E acquired The Walker Electrical Co. which manufactures low voltage distribution equipment, was $28.48, in contrast to the $32.92 per share in 1959. Alfred G. Bosanko (a former owner of Walker who participated in competitors' meetings both before and after the acquisition—Local Deposition, pp. 4–5) in early 1960 owned 25,883 shares of I–T–E stock, most, if not all, of which was acquired in the sale of Walker. (Local Deposition, p. 3)

26. It is clear from the corporate and personal gain achieved under the protective umbrellas of the illegal conspiracies that I–T–E's participation was not the result of coercion, but the result of I–T–E's belief that it is more profitable to fix prices by agreements with competitors than by the operation of a competitive market place. In short, I–T–E's action was dictated by its own selfish interest. As the senior Mr. Scott put it, in writing to A. Edward Newton on May 13, 1931:

> "I am by no means convinced that a 'hard and fast' price agreement [with G.E. and Westinghouse] would be to our advantage, and am in a position of 'wanting to be shown.'" (Letter attached as Exhibit C.)

Accordingly, plaintiffs submit that in no event could justice sanction a result which would deny plaintiffs compensation for I–T–E's illegally imposed overcharges and, at the same time, would leave the conspirators free to enjoy the profits of their illegal activities.

## IV. I–T–E'S FAILURE FOR TWENTY-EIGHT YEARS TO EXPOSE THE CONSPIRACIES

27. I–T–E first participated in price-fixing meetings at least as early as 1931 (Scott Deposition, p. 3), and in late 1959 was participating in illegal conspiracies affecting nine product lines. At no time in this twenty-eight year period did I–T–E take any meaningful action to expose the conspiracies and free itself of the allegedly adverse and allegedly unwelcome associations with "larger competitors."

28. I–T–E's sole, even colorable attempt to expose the conspiracies allegedly occurred in 1940, when Max Scott sent one Samuel Ostrolenk to visit the Department of Justice. The visit of Ostrolenk was acknowledged by Thurman Arnold, then Assistant Attorney General, who wrote Max Scott that he was advised Scott was "acquainted with certain information with respect to the circuit breaker industry which is of interest to this Department."

Max Scott testified that he let the matter rest there and did not follow up in any way to give information to the Justice Department, because he "rather expected they would approach [him] further, which they never did." (Scott Deposition, pp. 114–115.)

Max Scott proffered this feeble excuse even though Mr. Arnold's letter (attached as Exhibit D) closes:

> "It would be greatly appreciated if you would communicate with me concerning this matter."

29. I–T–E undoubtedly seeks to excuse its years of silence on the ground that it decided "not to risk the competitor retaliation which [Scott] expected *might* follow from pursuing such a complaint." (First Statement, para. 26, p. 910.) (Emphasis added.) I–T–E does not establish that Scott's "expectation" was a reasonable one and I–T–E does not explain why recourse to the courts would not prevent retaliation or provide I–T–E compensation for any "retaliation" which "might" have occurred.

30. The period of World War II (prior to the claims in the instant cases) afforded I–T–E a particularly apt opportunity to blow the whistle on the conspiracies. For in that period I–T–E's expansion into defense activities, together with a large demand for and short supply of electrical equipment, made I–T–E in-

vulnerable to "retaliation," even assuming that its competitors would attempt to retaliate. For example, I–T–E's sales jumped from $1,813,601 in 1939 to $8,189,378 in 1941, and $13,573,950 in 1942, and $17,494,428 in 1943. (Annual Reports 1946 and 1943.)

31. Railway & Industrial Engineering Company, a manufacturer of power switching equipment which was acquired by I–T–E in 1947, and others were involved in a government proceeding which ended in 1948 or 1949 in a consent decree prohibiting price-fixing. (Scott Deposition, pp. 91–92) I–T–E never appealed for protection to the court which entered the decree when it was later "coerced" into fixing prices for power switching equipment.

32. Mr. Buck attempted to explain I–T–E's failure to complain to the Justice Department on the ground that it would move too slowly to "insure the preservation of our Company against the *probable* competitive price pressures that would be brought upon us." (Buck Deposition, pp. 111–112) (Emphasis added.) When asked how long it took the Government to act once these matters were in fact brought to its attention, Buck replied (Deposition, p. 112):

> "Your Honor, I am a layman. I rather think that the Department of Justice activities were no doubt largely expedited by the national publicity which was given to this problem by the Tennessee Valley Authority and by the Kefauver Committee, rather than just an individual manufacturer saying, 'Help, help, I am being hurt.' "

33. I–T–E does not and, indeed, cannot justify its failure to expose the conspiracies merely because it feared the Justice Department would move too slowly. For I–T–E could at one fell stroke have informed: the Justice Department, the entire Executive branch of the Government, the Kefauver Committee, the entire United States Senate and House of Representatives, the TVA and all other

customers, and the top management and shareholders of all competitors. Just as I–T–E has not been put out of business since the conspiracies were exposed by others, it would not have been put out of business if it had itself exposed the conspiracies.

34. The truth of the matter is that I–T–E did not want the conspiracies to be exposed. For the existence of the conspiracies, as well as alleged "coercion," was carefully concealed by those directors and officers of I–T–E who participated in the conspiracies from the directors and officers who did not participate. (*E.g.*, Local Depositions Gerald J. Keady, William C. Willits, Joseph C. Chapman, Owen B. Rhoads, Ashton T. Scott.) Thus, the decision to remain silent was made by those who would be exposing their own illegal activity and who would be risking personal prosecution for such activity; and it is the same group who are now crying that there was "coercion" which the others never heard of except after the Grand Jury proceedings and that, as Mr. Ashton T. Scott so aptly phrased it (Local Deposition, p. 14):

> "I was certainly informed that that [coercion] specifically was part of our general, what, strategy of defense."

## V. ANALYSIS OF I–T–E's "WRITTEN STATEMENT," AS AMENDED

35. Plaintiffs submit that I–T–E's adamant refusal to comply with Local Pretrial Order No. 4 is sufficient ground for striking the alleged "coercion defense." Before I–T–E's Written Statements are examined in detail, however, it seems appropriate to highlight certain general matters in the light of which individual paragraphs in the Statements ought to be evaluated:

(a) The great majority of incidents cited by I–T–E in support of its alleged coercion defense relate to matters occur-

ring long after 1931, when I–T–E first participated in price-fixing meetings.

(b) The great majority of incidents cited by I–T–E relate at best to what General Electric, Westinghouse "and, occasionally Allis-Chalmers" *said* ought to be done or what they *said* they would do; and it is a rare occasion indeed in which I–T–E sets forth what in fact was done by it or its competitors.

(c) I–T–E claims that even "seemingly colorless incidents" ought to be viewed in light of the significance they have "to a person who has grown up in the industry." (First Statement, p. 2) Presumably the only I–T–E person meeting that qualification is Max Scott. However, there is no proof (indeed, there is no claim) that Max Scott was aware of all of the incidents cited by I–T–E or that Max Scott alone directed I–T–E in its participation in all of the conspiracies affecting all of the products involved in the Philadelphia criminal cases. This weakness in the Written Statements is particularly applicable to all of the matters cited by I–T–E which occurred *after* exposure of the conspiracies. (E.g., paragraphs 73, 74, 75, 76, 77, 78, 79.)

(d) I–T–E rarely identifies specific products in individual paragraphs of its Statements and thus obscures the fact that in some product lines it was larger and a more dominant factor in the conspiracies than General Electric, Westinghouse or Allis-Chalmers.

(e) I–T–E seems to believe that it has some sort of constitutional right to be free from any competition and it therefore construes any form of competition (whether from a larger or smaller competitor) as "coercion."

(f) The major thrust of the Written Statements is to attempt to establish that General Electric had at all times and for all electrical equipment products a national policy of "uniform prices" among all manufacturers of each product. (See, e. g., First Statement, para. 84, p. 61.) And failure to sustain that proposition carries with it a failure to sustain the allegation that General Electric would go to any length to force uniform pricing upon a competitor.

### I–T–E's Failure to Comply With Local Pretrial Order No. 4

36. Local Pretrial Order No. 4 requires, *inter alia,* statement of "all understandings or agreement" reached as a result of communications relating to coercion (Para. (3) (D) (iv)) and statement of "each course of conduct" undertaken by I–T–E as a result of each communication relating to coercion. I–T–E almost totally ignored these requirements in the initial Statement filed on March 9, 1965; and I–T–E's lack of compliance with the Order was not cured in the grudging, three page Amended Statement filed on April 5, 1965. Specifically, I–T–E has ignored these requirements in the following respects:

(a) Paragraph 15 alleges that in 1934 Watts of Westinghouse told Scott that I–T–E "had better conform to a uniform price policy" in the sale of circuit breakers to the U. S. Navy. The Statement fails to indicate whether I–T–E did in fact thereafter observe a uniform price policy.

(b) Paragraph 17 alleges that Davis of Allis-Chalmers called Scott in about 1936 and told him what to bid on a job for Carnegie Steel. The Statement fails to indicate what Scott in fact bid.

(c) Paragraphs 18 and 19 allege that in the mid-1930's Allis-Chalmers and General Electric warned Scott that "I–T–E [should] not disturb the price agreement for steel mill electrical purchases. * * *" The Statement fails to indicate whether I–T–E in fact conformed to the agreement.

(d) Paragraph 24 alleges that in 1938 or 1939 I–T–E was told that it "must stop selling switchgear with throat connections or there would be a price war." The Statement fails to indicate whether I–T–E in fact stopped selling such switchgear. (If I–T–E continued to sell it, was there a price war?)

(e) Paragraph 29 alleges an incident shortly after World War II in which Tinnerholm of General Electric told Scott that I–T–E should protect GE's bid on a particular job. The Statement fails to indicate whether I–T–E in fact protected GE's bid.

(f) Paragraph 31 alleges that Tinnerholm warned Scott in about 1947 that GE would enforce price stability for power switching equipment if the "independent companies" did not do it. The Statement fails to indicate whether I–T–E itself charged "stable" prices and whether I–T–E policed the prices of others.

(g) Paragraph 43 alleges that after I–T–E acquired Kelman and endeavored to market its products nationally, then its competitors "attempted to talk with I–T–E employees about Kelman's business." The Statement does not even indicate whether in fact competitors did "talk."

### I–T–E's Own Demonstration of Its Ability to Withstand "Coercion"

37. Paragraph 67 of I–T–E's Statement boldy proclaims:

"Notwithstanding discussions among competitors at the Traymore meeting referred to in paragraph 57 and at other meetings, I–T–E personnel were instructed to run I–T–E's business their own way."

The Traymore meeting occurred in November, 1958 and, allegedly, I–T–E at that time had been subjected to irresistible coercion for some twenty-seven years! Hence, either the allegation of Paragraph 67 or the allegation of coercion is a complete falsehood.

38. Paragraph 57 also alleges that I–T–E employees were instructed after Traymore "to run I–T–E's business their own way." These instructions were issued even though it is alleged that at Traymore "it was clear to Buck that the only choice for I–T–E was to return to pricing some sales of some equipment at book or to face a continuation of the then existing price war. * * *" The alleged course of action is of course completely inconsistent with the alleged coercion and it is impossible to take seriously I–T–E's efforts to advance both propositions at the same time. In its Amended Statement, I–T–E attempts to remove itself from this dilemma by "generously" admitting that as a result of the "threats" at Traymore, I–T–E employees attended meetings and "discussed" allocation and prices. Local Pretrial Order No. 4 requires that "agreements" be set forth and I–T–E must admit either that it did in fact enter into *agreements* on allocation or prices or admit that its "coercion defense" is, to borrow a favorite phrase of I–T–E's counsel, "a recent fabrication" for the purpose of these cases.

39. Other allegations of I–T–E's Statement also establish that I–T–E could and did defy its "larger competitors," when it was in I–T–E's interests to do so, and thus establish I–T–E's ability to withstand the alleged coercion. See, e. g., Paragraphs 33, 42 (cancellation by I–T–E of GE license to Kelman), 45 and 60 through 64.

### "Coercion" and Max Scott

40. In large measure, I–T–E's story of coercion is the story of Max Scott, for many I–T–E employees who participated in meetings admitted that they were not coerced by competitors into doing so. (E. g., Spencer Deposition, p. 335; Day Deposition, p. 36.) · Scott, on the other hand, relates "direct threats" over several decades and, in more recent times, conversations which he allegedly interpreted as threats:

(a) Paragraph 6 alleges that Scott was told in the early 1930's that "I–T–E would have to cooperate on prices and stop quoting non-uniform prices."

(b) Paragraph 15 alleges that in about 1934 Watts of Westinghouse told Scott that I–T–E "had better conform to a uniform price policy" on navy circuit breakers.

(c) Paragraph 19 alleges that at least twice during the period 1934–1938, Fairman of General Electric and Davis of Allis-Chalmers warned Scott "not to upset the price levels."

(d) Paragraph 21 alleges that in the mid-1930's Davis of Allis-Chalmers told Scott "there was no alternative to uniform prices" and that "free quoting would result in a price war with prices of 40% off book. * * *"

(e) Paragraph 30 alleges that Hoffman of General Electric told Scott, sometime between 1945 and 1949, that he had been ordered to establish printed price sheets for as many switchgear items as possible and further alleges that "this report to Scott was a further threat that prices were to be uniform. * * *"

(f) Paragraph 31 alleges that in about 1947 Tinnerholm of General Electric told Scott that "price policing" for power switching equipment would be left to "the independent companies" but that GE "might very well" cut prices if necessary to "bring about stability."

(g) Paragraph 38 alleges a conversation in late 1955 or early 1956 between Scott and Jewell of Westinghouse which Scott interpreted as "a clear warning" that material price deviations should be eliminated or "there would probably be another price war."

(h) Paragraph 40 alleges that in 1958 Singleton of Allis-Chalmers told Scott that I–T–E was quoting "free prices" and was thereby "upsetting the electrical power equipment industry." This paragraph further alleges that "Scott found a threat in this conversation. * * *" (Parenthetically, it is noted that there is no indication of how hard Scott had to look!)

(i) Paragraph 46 alleges a meeting between Scott and Walker of Westinghouse in 1958 and alleges that the conversation "clearly implied" to Scott "that any failure on I–T–E's part to do what General Electric, Westinghouse and Allis-Chalmers were seeking could only result in a continuation of the abnormally low price levels then being quoted for switchgear."

(j) Paragraph 48 refers to a meeting in April, 1958 between Scott and Paxton of General Electric and alleges that:

"Based upon Scott's experience over several decades, there was no doubt in his mind that Paxton's remarks were a threat and a direction to Scott to quote book prices. * * *"

(k) Paragraph 55 refers to a meeting in October, 1958 between Scott and Burens of General Electric during which Burens allegedly stated that unless all circuit breaker manufacturers went back to book prices, existing low price levels would continue. This paragraph then alleges that "Scott regarded these statements as a threat."

41. Thus, in the 1930's, in the 1940's, and in the 1950's, Scott was being "threatened" because of I–T–E's "nonuniform" prices. According to Max Scott's story, even if it is true, I–T–E was constantly threatened by larger competitors for constantly failing to quote uniform prices. This establishes beyond cavil that I–T–E was in fact able to withstand the pressures (if, indeed, there were any) exerted by its larger competitors. It therefore follows that the alleged "coercion defense" is without merit.

42. In striking contrast to the allegation in Paragraph 48 concerning the Scott-Paxton meeting (that there "was no doubt" in Scott's mind that "Paxton's remarks were a threat and a direction to Scott to quote book prices"), is Scott's sworn testimony before the Kefauver Committee that, after the meeting, he "was left in a quandry" as to whether Paxton even knew of the current competitors' meetings. (Kefauver, p. 17504) Scott also testified before the Kefauver Committee (p. 17513):

"Now, I would like to say in fairness, partly to myself I admit, and

certainly to Mr. Paxton, that in the discussions with Mr. Paxton I think there was certainly nothing done or said by either of us which was improper. If there was a tape recording of that meeting with Mr. Paxton here, I think it would be agreed that nothing illegal was said. Certainly, I had nothing illegal in mind. I see where I might have been misunderstood. What Mr. Paxton had in mind, of course, is open to conjecture on my part, and others."

43. Max Scott's concern with "coercion" is clearly of recent vintage. For example, he testified under oath that "about 1949" he instructed McCauley to stop attending competitors' meetings on power switching equipment and:

"What he did in that subsequent period, I do not know." (Scott Deposition, p. 90)

Obviously, Mr. Scott had no contemporary concern as to what "retaliation" competitors might undertake for he was not concerned as to whether the competitors' meetings were or were not continued.

### The Alleged "National Policies" of General Electric

44. I–T–E alleges that General Electric had a company-wide, nation-wide policy of price uniformity for all of its products. It was to preserve this policy, I–T–E alleges, which caused General Electric to insist upon price uniformity among its competitors. (See paragraphs 3, 6, 32, 73, 79, 83, 84) There is no evidence whatsoever that there was or is any such policy on GE's part. All that I–T–E offers to support it are the statements of Scott and Buck and misinterpretations of Cordiner's testimony. Cordiner, during extensive examination by counsel for I–T–E, testified flatly that "there was no overall company policy on pricing." (Cordiner Deposition, p. 361) Moreover, it is clear that there was never any GE policy never to be underbid by a competitor, because, in such an event, GE would have obtained virtually all sealed-bid business.

45. I–T–E also advances two completely contradictory positions with respect to GE:

Paragraph 81—GE was able to subsidize low prices for products in this litigation from sales in other product lines; and

Paragraph 55—"Interdivisional pressures" within GE caused Burens to want to increase low switchgear prices, because others "feared their pricing structures would be under attack. * * *"

I–T–E cannot have it both ways. And, in fact, it is apparent that GE's other divisions and other products were not used to subsidize low switchgear prices and it is equally apparent that divisions with better prices did urge Burens to meet with competitors to stabilize prices because they wanted no interference with their price levels.

46. I–T–E also attempts to establish that the national outlook and persistent cooperation of General Electric and Westinghouse traces back to a so-called "60–40 agreement" in the period 1896–1911. This alleged agreement was placed in proper perspective by Mr. Price, counsel for I–T–E, when I–T–E was first asked to produce documents relating to it:

"Mr. Price: We will produce them if your Honor will direct it, but it seems to me it would be preposterous to get material of that ancient vintage relating to something that couldn't possibly have any bearing on the present litigation into the case." (Scott Deposition, p. 122)

### I–T–E Was a Willing and Active Participant in the Conspiracies

47. It is clear that I–T–E not only attended competitors' meetings willingly, but also that I–T–E was willing to continue even after it knew of the Government's investigation. For example, Buck testified (Deposition, p. 78):

"Q. Following the September 1959 meeting at the Warwick was there a subsequent meeting that you attended? A. No, sir. There was not.

"Q. Was there any discussion at the Warwick Hotel meeting in September 1959 of the pendency of any Government investigation? A. I don't recall any whatsoever.

"Q. Had it come to your attention by the time of that meeting that such an investigation was pending? A. It had in the press.

"Q. But that was not raised at the meeting by anybody? A. I don't recall it having been raised.

"Q. Did the meetings then just terminate for lack of anyone inviting you to another or convening another? A. I don't know how they terminated or failed to reconvene except in my own case and that is Mr. Burger telephoned me [115] that a meeting that had been set for some time subsequent to September, say early or mid October would not be held.

"Q. And did you ask why? A. I certainly did.

"Q. And did he say? A. He said there would be no further meetings until in their judgment they could be held. That there were industry investigations or others going on, that it was deemed advisable on their part to hold no further meetings."

48. Clarence E. Burke, one of the persons forced to resign by General Electric testified (Deposition of Nov. 27 and 28, 1962, p. 281):

"Q. Mr. Burke, did you ever at any time coerce anybody from I–T–E to attend any of these meetings? A. I don't recall ever coercing anyone to attend these meetings.

"Q. Did you ever have to threaten anyone in I–T–E to get them to attend? A. No, sir.

"Q. Do you know of anybody in the General Electric Company who ever had to bring some sort of threat or some sort of economic duress on I–T–E to get them to attend these meetings? A. Oh, no, none whatsoever.

"Q. Were they as anxious to attend as anyone else in your experience over the years? A. My experience was that the smaller manufacturers —and particularly I–T–E Company —was continually pursuing us to get us to attend. "I remember even after we knew that this investigation had us by the coat tails, at a dinner downtown for the Christians and Jews Association, benefit, and so forth, Mr. Buck chased Mr. Stehlik and me all over the place, because [N5109] when he first called us he said, 'when we going to get together again? We got to get together again.'

"And then he and I said, 'We can't talk about that,' and disappeared, and we were forever ducking him, because he is chasing us to try to get us to get together again.
"That was in November of '59."

49. Crawford testified that Glover of I–T–E always called him during the period Crawford did not attend meetings (Crawford, pp. 191–192); that it was never necessary to pressure I–T–E to join "in this enterprise"; that he never heard of coercion of I–T–E and in fact "It was the other way around, if anything, on this isolated phase bus." (Crawford Deposition, p. 214)

50. Hentschel testified that Buck made "one or two telephone calls * * * trying to get us to again have some further meetings" after the meetings had

been terminated; and that he never exerted any coercion toward I–T–E. (Hentschel Deposition, p. 69; p. 110)

51. Hentschel also testified that at a meeting in late 1958 Schmidt and Buck complained as to the prices for certain power switchgear assemblies on GE's new price lists and that, at I–T–E's insistence, the multiplier was increased from .50 to .55 (a 10% increase). (Hentschel Deposition, p. 67)

52. Gezon testified that after the meetings were terminated I–T–E pleaded that meetings be resumed. (Gezon Deposition, p. 120)

53. Numerous witnesses have testified that there was no coercion. See, in addition to Spencer and Day as previously cited: Fuller, p. 359; Stehlik, p. 45; Burens, p. 265.

54. I–T–E and its predecessor, Railway & Industrial Engineering Co., actually were the ringleaders in the power switching equipment conspiracy. Harry A. Glover, an I–T–E employee, testified in his national deposition that he called and made the arrangements for most of the competitors' meetings, because (pp. 61–62):

"A. It is my belief that in the history of the power equipment group of people that met at such meetings that my—not necessarily Mr. Wilcox, my immediate predecessor, but it is my belief that he and in turn his former predecessor, a man by the name of McCauley, who was retired from the company when I came there in 1954—it is my understanding from the history of the meetings that Mr. McCauley generally called them, and I guess when Mr. Wilcox took his position, he probably became the chair, so to speak, and it seems I guess they expected me to be the chair since the old R&IE Equipment Division, now the [N30743] Greensburg Division, apparently had the dubious privilege, I guess you would call it."

55. I–T–E refers to alleged coercion in the power switching equipment area in Paragraph 58, citing the testimony of J. D. Hoffman of Joslyn Mfg. Co. I–T–E cites this to support an allegation that Pyle of Westinghouse "in accord with General Electric" told competitors price-cutting had to stop or "they" would lower published prices from 10% to 20% and if that did not stabilize the market "maybe discounts of 20, 30 and 40 will." Mr. Midgett, counsel for I–T–E, examined Hoffman at length on this point (whether there was "accord" on the matter between Westinghouse and GE) and Hoffman made it abundantly clear that Mr. Midgett was incorrectly reading the grand jury testimony relied upon by him to try to establish this point; and Hoffman also made it abundantly clear that it was *I–T–E* in accord with Westinghouse which threatened the others that discounts would be lowered if prices were not stabilized:

"The Witness: That the accord was being read into the questions and answers here between GE and [N22742] Westinghouse was not that apparent to me. There was a greater accord between RI&E and Westinghouse.

"So if you rephrase that and say did the accord between RI&E and Westinghouse give me concern, I believe that would be easier to answer." (Hoffman Recall Deposition, p. 25)

56. The best illustrations of the "pressures" exerted upon I–T–E are the results of the sealed-bid allocations agreed upon at the Traymore meeting where I–T–E objected to 2% in circuit breakers and got 4% and I–T–E objected to 10½% in power switchgear assemblies and got 11%. When Buck was asked how he got the allocation up to 11%, he testified:

"I would say it was probably more because they [the competitors] didn't want me to walk out of the room *and leave them unable to do*

*the things they wanted to do."*
(Buck Deposition, p. 114) (Emphasis added.)

Thus, I-T-E stood in 1958 precisely where it stood in 1931: judging the "hard and fast agreements" in light of its own selfish interests.

## VI. SUMMARY AND CONCLUSION

57. I-T-E offers a hodgepodge of isolated instances of alleged "uniformity" and "threats" (Paragraphs 14–17, 20, 25, 29, 33) out of the tens of thousands sales and quotations, involving hundreds of millions of dollars, made by I-T-E from 1931 to 1960; and these few events, even if true, show the poverty of I-T-E's alleged coercion defense. Indeed, many of the incidents cited by I-T-E in fact show that I-T-E could and would defy its "larger competitors" when it was in its interests to do so.

58. Equally important, the incidents cited by I-T-E hardly amount to "coercion." Undoubtedly, when a proposal is made to agree to increase prices, it is logical for someone to observe that the increase "won't fly" unless all agree to it. The language of price-fixers was ever thus.

59. Under the protective umbrellas of mulitple conspiracies, I-T-E has grown from a company with a net worth in 1931 of $1,074,692 to one with a net worth in 1959 of $46,479,263. And the individuals who directed I-T-E in its career of conspiracy (as shown in Part III), shared, through salaries, dividends and the increase in stock value, in the profits of the illegal activity. If "coercion" existed (and we submit that it clearly did not), I-T-E was fully aware of it when it voluntarily embarked upon the manufacture and sale of the products involved in this litigation. Therefore, I-T-E's coercion defense, reduced to its essentials, is a contention that if it can grow only by violating the antitrust laws, then it has the right to violate those laws and injured customers be damned.

60. Furthermore, I-T-E has totally failed to justify its twenty-eight years of silence. If unlawful pressures were in fact exerted upon I-T-E, it had ample opportunity to take action to redress or remove them.

61. Plaintiffs, of course, believe that there is no such thing as a "coercion defense" to an antitrust treble-damage action. But in any event, it is clear that the law could not sanction any defense which would deny injured customers compensation for illegal overcharges and, at the same time, leave the price-fixer with the profits of its illegal activity.

Respectfully submitted,

_____

Charles A. Bane
Robert F. Hanley
Richard E. Powell
Donald J. McLachlan
Michael I. Miller
 Attorneys for Commonwealth
 Edison Company, et al.

Of counsel

ISHAM, LINCOLN & BEALE
72 West Adams Street
Room 1700
Chicago, Illinois 60603
726–0425

DATED: June 7, 1965

EXHIBIT - A -

REPORT OF
CERTIFIED PUBLIC ACCOUNTANTS

SHAREHOLDERS OF
I·T·E CIRCUIT BREAKER COMPANY

We have examined the accompanying consolidated balance sheet of I·T·E Circuit Breaker
Company and its subsidiary companies at December 31, 1964, and the related statements
of consolidated income and surplus for the year then ended. Our examination of the
Company and the domestic subsidiary was made in accordance with generally accepted
auditing standards, and accordingly included such tests of the accounting records
and such other auditing procedures as we considered necessary in the circumstances.

The financial statements of the consolidated Canadian subsidiary companies for the year
1964 as reported upon by other independent accountants, have been reviewed and
accepted by us and incorporated in the consolidated financial statements herewith.

In our opinion, subject to the outcome of the litigation referred to on page 9, the statements
mentioned above present fairly the consolidated financial position of I·T·E Circuit Breaker
Company and its subsidiary companies at December 31, 1964, and the consolidated results
of their operations for the year then ended, in conformity with generally accepted accounting
principles applied on a basis consistent with that of the preceding year.

Philadelphia, Pa.
February 18, 1965

*Arthur Young & Company*

ARTHUR YOUNG & COMPANY

# ten-year statistical review

| | 1964 | 1963 | 1962 | 1961 | 1960 | 1959 | 1958 | 1957 | 1956 | 1955 |
|---|---|---|---|---|---|---|---|---|---|---|
| Net Sales | $129,026,476 | $110,238,908 | $111,735,408 | $111,486,544 | $115,488,158 | $118,500,718 | $111,454,901 | $124,544,952 | $106,922,225 | $ 73,025,703 |
| Income Before Income Taxes | 7,219,313 | 594,156 | 2,828,855 | 1,160,082 | 20,304 | 4,968,715 | 7,917,120 | 13,292,308 | 11,157,431 | 3,609,223 |
| Income Taxes | 3,322,036 | 308,081 | 1,363,192 | 335,076 | 321,690 | 2,212,819 | 4,016,655 | 6,924,121 | 5,856,135 | 1,833,400 |
| Net Income (Loss) | 3,888,510 | 287,693 | 1,462,196 | 820,757 | (286,338) | 2,747,853 | 3,861,778 | 6,343,826 | 5,247,311 | 1,758,325 |
| Common Dividends Paid | 450,340 | 193,003 | 193,003 | 193,003 | 1,286,684 | 2,314,498 | 2,289,183 | 2,008,559 | 1,170,896 | 838,964 |
| Preferred Dividends Paid | 140,426 | 149,361 | 153,982 | 160,718 | 172,488 | 186,125 | 197,002 | 209,214 | 218,704 | 227,764 |
| Net Income in Excess of Dividends | 3,297,744 | (54,671) | 1,115,211 | 467,036 | (1,745,510) | 247,230 | 1,375,593 | 4,126,053 | 3,857,711 | 691,597 |
| Plant & Equipment Additions & Replacements | 3,709,003 | 2,915,966 | 1,970,677 | 1,660,366 | 2,501,982 | 4,186,845 | 3,852,220 | 4,677,600 | 3,479,983 | 2,686,130 |
| Fixed Assets (Less Depreciation) | 20,301,735 | 19,695,478 | 19,769,064 | 20,696,980 | 21,994,986 | 22,389,758 | 20,952,587 | 18,814,963 | 16,576,709 | 13,788,993 |
| Working Capital | 40,917,730 | 38,234,318 | 37,970,263 | 35,594,735 | 33,716,553 | 36,289,314 | 37,817,963 | 38,256,964 | 25,805,097 | 21,620,383 |
| Net Worth | 48,447,056 | 45,335,915 | 45,448,629 | 44,627,442 | 44,355,305 | 46,479,263 | 46,351,647 | 44,800,242 | 39,812,129 | 32,194,624 |
| Common Shares Outstanding | 1,286,684 | 1,286,684 | 1,286,684 | 1,286,684 | 1,286,684 | 1,286,684 | 1,285,617 | 1,266,797 | 1,226,227 | 1,032,632 |
| Earnings (Loss) Per Common Share | $ 2.91 | $ .11 | $ 1.02 | $ .51 | $ (.36) | $ 1.99 | $ 2.85 | $ 4.84 | $ 4.49* | $ 1.48 |
| Dividends Declared Per Common Share | .35 | .15 | .15 | .15 | 1.00 | 1.80 | 1.80 | 1.62½ | 1.07½ | .81½ |
| Net Worth Per Common Share | 35.22 | 32.62 | 32.65 | 31.93 | 31.60 | 32.92 | 32.69 | 31.65 | 28.48 | 26.21 |
| Stock Dividends Common Shares | — | — | — | — | — | — | — | 2% | 4% | — |
| Employees | 7,085 | 7,332 | 7,426 | 7,634 | 8,253 | 8,622 | 7,842 | 8,129 | 8,449 | 6,824 |
| Shareholders | 3,701 | 4,468 | 4,885 | 4,996 | 5,099 | 3,884 | 3,568 | 3,557 | 3,117 | 2,935 |

*Average number of shares.

Subsidiaries included from dates as shown: Kelman, Aug. 1, 1956; Walker, Dec. 31, 1956;
Chase-Shawmut, Jan. 1, 1957; Canadian Porcelain, July 1, 1958; Wilson, Nov. 1, 1958; Standard,
Sept. 1, 1960.

# I - T - E CIRCUIT BREAKER COMPA

*Ten Year*

| | 1956 | 1955 | 1954 | 1953 |
|---|---|---|---|---|
| Net Sales................ | $106,922,225 | $73,025,703 | $67,727,462 | $61,785,157 |
| Profit Before Taxes......... | 11,157,431 | 3,609,223 | 3,609,202 | 5,165,442 |
| Income Taxes.............. | 5,856,135 | 1,833,400 | 1,942,458 | 3,003,550 |
| Net Income([1])............. | 5,247,311 | 1,758,325 | 1,635,541 | 2,134,845 |
| Common Dividends Paid... | 1,170,896 | 838,964 | 1,148,319 | 845,312 |
| Preferred Dividends Paid... | 218,704 | 227,764 | 160,362 | 20,024 |
| Income Retained in Business................. | 3,857,711 | 691,597 | 326,860 | 1,269,509 |
| Plant and Equipment Additions and Replacements.. | 3,479,983 | 2,886,130 | 2,121,733 | 2,364,859 |
| Fixed Assets (Less Depreciation)...... | 16,576,769 | 13,788,993 | 12,363,514 | 9,071,455 |
| Working Capital........... | 25,805,097 | 21,620,383 | 23,069,554 | 14,480,915 |
| Net Worth................ | 39,812,129 | 32,194,624 | 31,616,479 | 20,448,754 |
| Common Shares Outstanding([2])........... | 1,226,227 | 1,032,632 | 1,032,632 | 805,359 |
| Earnings Per Common Share([2])........ | 4.49([3]) | $ 1.48 | $ 1.59([3]) | $ 2.80([3]) |
| Dividends Declared Per Common Share([2])........ | 1.07½ | .81¼ | 1.25 | 1.21⅞ |
| Net Worth Per Common Share([2])........ | 28.48 | 26.21 | 25.53 | 25.39 |
| Stock Dividends Common Shares......... | 4% | — | — | 5% |
| Employees................ | 8,449 | 6,824 | 6,432 | 5,086 |
| Shareholders.............. | 3,117 | 2,935 | 2,561 | 1,853 |

Erie Avenue
PHILADELPHIA, PENNSYLVANIA

([1]) *After minority interest of Eastern Power Devices Limited.*
([2]) *Adjusted to $5.00 Par Value.*
([3]) *Average Number of Shares.*

## ᴹ Y A N D S U B S I D I A R Y C O M P A N I E S

## Statistical Review

| 1952 | 1951 | 1950 | 1949 | 1948 | 1947 |
|---|---|---|---|---|---|
| $65,033,122 | $48,988,686 | $34,784,425 | $29,503,635 | $29,693,332 | $19,080,167 |
| 7,648,037 | 4,821,468 | 3,046,938 | 1,946,899 | 3,195,387 | 2,406,316 |
| 4,966,690 | 2,866,894 | 1,339,975 | 805,916 | 1,290,655 | 963,436 |
| 2,620,429 | 1,921,565 | 1,677,898 | 1,117,460 | 1,885,093 | 1,363,792 |
| 572,242 | 412,124 | 297,349 | 281,495 | 234,633 | 134,642 |
| 129,262 | 27,376 | .——— | — | — | — |
| 1,918,925 | 1,482,065 | 1,380,549 | 835,965 | 1,650,460 | 1,229,150 |
| 1,318,501 | 3,370,686 | 1,306,277 | 1,012,654 | 741,045 | 1,213,080 |
| 7,254,903 | 6,961,689 | 4,457,681 | 3,631,152 | 3,000,842 | 2,563,654 |
| 13,880,807 | 12,424,514 | 8,688,031 | 8,107,993 | 7,403,696 | 6,135,339 |
| 17,716,159 | 15,797,234 | 11,354,076 | 9,975,895 | 9,114,287 | 7,173,937 |
| 596,728 | 531,844 | 531,844 | 483,494 | 426,612 | 426,612 |
| $ 4.17 | $ 3.56 | $ 3.15 | $ 2.31 | $ 4.42· | $ 4.21(3) |
| 1.06¼ | .77½ | .60 | .60 | .55 | .40 |
| 25.69 | 23.78 | 21.35 | 20.63 | 21.36 | 16.82 |
| 5% | — | 10% | 13⅓% | — | 5% |
| 5,011 | 4,955 | 3,853 | 3,089 | 3,204 | 3,030 |
| 1,582 | 1,419 | 665 | 513 | 409 | 288 |

Subsidiaries included from dates as shown:
R&IE and E.P.D., Nov. 1, 1947; Victor, Dec. 1, 1953; BullDog, June 1, 1954;
Kelman, Aug. 1, 1956; Walker, Dec. 31, 1956.

Exhibit C

May 13, 1931.

My dear Ned:

Yours of the 1st instant at hand. I note that you are one of the "gentlemen" who has joined the ranks of those who prefer Federal Land Bank Bonds, but have been unable to find anyone willing, on satisfactory terms, to gratify your desire for a million of them. As to the other matters, nothing has happened. We had our conference with G. E. and Westinghouse salesmen in regard to maintaining prices. The Westinghouse man by the name of Neal struck me as being decidedly the best of the bunch; Max had met him previously and was likewise favorably impressed. I purposely got out when generalities had been concluded and before specific matters were dealt with. I am by no means convinced that a "hard and fast" price agreement would be to our advantage, and am in a position of "wanting to be

shown." The proportions of business done last year appear to be as follows:—

Westinghouse ............ 4
General Electric .......... 8
I–T–E .................. 22.

I am anxious to avoid any program which might lead to a division of the business less favorable to us. I haven't seen Swift since the conference, but understand from Max that nothing was agreed upon, and that the matter will be discussed further at the NEMA meeting. It looks to me as though it might be a good thing for all hands to agree to show prices at which business had been taken if called upon to do so; this would probably put a break on any unconscionable price cutting. I cannot forget that "like causes produce like effects"; if we want to get more out of our circuit breaker business than the other people get out of theirs, it seems to me we can only do it by running it differently and not by running it the same as they do; I fancy, however, that all of this will keep until you get home.

Doubtless you have heard of the death of Swift's friend, Walter Strong—another golf victim. Swift is attending the funeral to-day. I suppose it is hardly likely that Pacific Coast papers have notice of the death of our old friend Charles Day, formerly of Day & Zimmerman. Reading between the lines, it seems to have been caused by a malignant condition in the head not far from one of the eyes. I was rather surprised to learn that Mr. Day was only 52 years of age.

I have just seen the draft of our April report and it seems to indicate that our dead-line is now at least as low as $80,000. per month. Our bonus system is far more automatic than we had realized; it is the operation of this feature which has in the main been responsible for the lowering of our dead-line.

I was getting myself mentally under way to follow out your suggestion that I see Beam in your absence when along comes a letter from Carr indicating that he still counts himself in on the proposition. I had Margaret write him that his letter would be brought to your attention immediately upon your return which it was indicated would be about the middle of June. Under the circumstances, it does not seem wise for me to inject myself into the matter in your absence. Carr undoubtedly thinks he has a "hatching egg" in this matter, and it will take our best efforts to put him where he belongs.

We are getting a lot of rain now and the foliage of the trees has almost an English aspect; in fact, I do not believe you are having anything finer in California than what we have right here at home; that is, of course, barring your celebrities. I haven't seen one of these things in a long time and don't know that I would recognize one if I did; of course, with the exception of my partner.

As to the business situation, I simply cannot alarm myself. We have gone through aplenty in the way of depression, and will doubtless go through aplenty more before things get right again, but in my judgment the ultimate recovery is as inevitable as the coming of the seasons in their turn, and I never knew of a reasonably rugged patient, who had been thoroughly physiced, who did not in time develop a hearty appetite; it is sure that business has had the one, and to me it seems equally sure that it is headed toward the other. In the meantime, our May orders are only a trifle off of those of May a year ago, but why should I pester you with insignificant details like this. Of course, it will be a

great joy for me to see you once again, but don't hurry back on my account.

Give kindest regards to Mrs. Newton, accept same also for yourself.

Yours as ever

Mr. A. Edward Newton,

Hotel Fairmount,

San Francisco, Calif.

WMS'H

Appendix C

CYRUS H. ADAMS
EDWARD M. BULLARD
RALPH D. STEVENSON
CALVIN D. TROWBRIDGE
MARSHALL G. SAMPSELL
ROLAND K. SMITH
CHARLES A. BANE
JUSTIN A. STANLEY
WALTER J. HARTMANN
OVE B. DENDTLER
LEO O. McCABE
DEAN A. ESLING
GENE C. DAVIS
WILLIAM W. DARROW
FREDERICK R. CARSON
ARTHUR C. GEHR
ROBERT B. WILCOX
RICHARD G. FERGUSON
LIVINGSTON FAIRBANK, JR.
ROBERT E. CRONIN
ROBERT F. HANLEY
THOMAS L. NICHOLSON
EILEEN STRANG
ROBERT A. HELMAN
ROBERT WOOD TULLIS
RICHARD E. POWELL
A. DANIEL FELDMAN
PHILIP F. PURCELL

**ISHAM, LINCOLN & BEALE**
COUNSELORS AT LAW
72 WEST ADAMS STREET
CHICAGO, ILLINOIS 60603

TELEPHONE 726-0425
AREA CODE 312

CABLE ADDRESS: MAHSI

EDWARD S. ISHAM, 1872-1902
ROBERT T. LINCOLN, 1872-1889
WILLIAM G. BEALE, 1885-1923

COUNSEL
HARRY J. DUNBAUGH

ASSOCIATES

SHARON L. KING
PETER A. TOMEI
CALVIN D. TROWBRIDGE, JR.
KENNETH K. HOWELL
EDWARD E. GIBSON
JON R. LIND
JAMES E. KNOX, JR.
DONALD J. McLACHLAN
MICHAEL I. MILLER
DAVID J. ROSSO
DAVID L. LANGE
JOHN L. McCAUSLAND
FRANCIS O. SPALDING

ROBERT C. BARNEY

March 15, 1965

The Honorable Edwin A. Robson
Judge, United States District Court
Northern District of Illinois
United States Federal Building
Dearborn & Adams Streets
Chicago, Illinois

Dear Judge Robson:

We have reviewed the statement filed on behalf of I-T-E Circuit Breaker Company on March 9, 1965, pursuant to Local Pretrial Order No. 4. In our view, the statement clearly fails to meet the requirements of Local Pretrial Order No. 4 and such failure is not warranted by the purported justifications set forth at pages 71 through 73 of the statement.

One of the most glaring of the many deficiencies of the statement is the almost total failure to "describe fully each course of conduct undertaken" by I-T-E as a result of communications, conversations and meetings among competitors. (Local Pretrial Order No. 4, para. (3) (D) (V). To illustrate, paragraphs 8, 23, 45 and 57 of the statement (among others) indicate rather explicitly agreements among competitors or acts I-T-E was "told" to do; however, there is no indication whatsoever of what I-T-E in fact did thereafter. (For example, in paragraph 23, the statement claims that sometime in 1938 General Electric and Westinghouse insisted that I-T-E sell 5 KV metal-clad air switchgear at a level "about 130% of switchgear embodying oil circuit breakers." There is no indication in the statement as to what level I-T-E in fact thereafter sold such switchgear.)

This appears to us to be a fatal defect in the statement. If I-T-E's actual course of conduct consistently deviated

The Honorable Edwin A. Robson
Judge, United States District Court
March 15, 1965
Page Two

from the course it alleges it was being coerced to follow, then the alleged "coercion defense" falls of its own weight.

Since I-T-E is attempting to put in issue "a mosaic of incidents [largely undefined and unspecified] stretching in time throughout virtually the entire history of the electrical manufacturing industry and across many product lines," (Statement, p. 2) we believe that I-T-E should be compelled to comply with Local Pretrial Order No. 4 before plaintiffs are forced to incur virtually unlimited expenses and burden in attempting, as "outside observers," to discover what might appear to "have significance to a person who has grown up in the industry . . . ." (Statement, p. 2)

We are stating our position with respect to I-T-E's statement by letter, rather than a motion to compel further answer, because of the agreement that the statement would be treated with confidentiality, subject to further order of the Court. While we believe that the inadequacy of the statement is apparent, we are of course willing to submit briefs on the matter if your Honor wishes them.

Very respectfully yours,

ISHAM, LINCOLN & BEALE

By *Richard E. Powell*
Richard E. Powell

REP/mam

cc: Elroy C. Sandquist, Jr., Esq.
Raymond W. Midgett, Jr., Esq.

---

May 9, 1940

Exhibit D

DEPARTMENT OF JUSTICE
WASHINGTON, D. C.

Mr. Max Scott
The I. T. E. Circuit Breaker Company
19th and Hamilton Streets
Philadelphia, Pennsylvania
Dear Sir:

Mr. Samuel Ostrolenk, of 10 East 40th Street, New York City, New York, has advised Mr. Joseph Borkin, of my staff, that you are acquainted with certain information with respect to the circuit breaker industry which is of interest to this Department.

It would be greatly appreciated if you would communicate with me concerning this matter.

Very truly yours,

Appendix C

THURMAN ARNOLD
Assistant Attorney General

MEMORANDUM ON THE I–T–E "COERCION STATEMENT" REQUIRED UNDER LOCAL PRETRIAL ORDER NO. 4

This memorandum reviews the "coercion statement" only in the context of whether I–T–E has complied with Local Pretrial Order No. 4. The memorandum

does not, for example, review and evaluate testimony elicited in national depositions which refutes I–T–E's claim of coercion. Comparison of the statement against the requirements of Local Pretrial Order No. 4 demonstrates a conscious design to avoid the requirements of the order and, further, that the defects of the statement cannot be justified by the excuses proffered by I–T–E.

1. A conscious design to avoid the requirements of Local Pretrial Order No. 4 is evident from the almost total failure to state what I–T–E in fact *did* in relation to specific "threats" and "meetings." This is particularly apparent in such Paragraphs as Nos. 8, 23, 45, 48 and 57. Illustratively, paragraph 48 refers to an April, 1958 meeting between Scott and Paxton (then President of GE) and alleges:

" * * * there was no doubt in his [Scott's] mind that Paxton's remarks were a threat and a direction to Scott to quote book prices for switchgear or face the prospect of General Electric lowering book prices until I–T–E came into line."

There is no statement, as required by the Order (Para. (3) (D) (V)), as to whether I–T–E complied with or ignored the threat.

This approach should be contrasted with the specificity employed by I–T–E in recounting rather minor incidents in history relating to a few specific bids or instances where GE "undercut" prices. (For example, paragraphs 14, 15, 17, 20, 33 and 54.)

Nor could any of the excuses advanced by I–T–E, under any conceivable circumstance, justify its treatment of the Scott-Paxton meeting. Surely Mr. Scott knows whether he took any action as a result of those "threats" or "directions."

2. Without any organization or chronological development by product line, I–T–E has referred to a number of products other than power switchgear assemblies (e.g., circuit breakers, power switching equipment) and, most often, simply does not identify specific products.

For example, in paragraph 57 with respect to the Traymore meeting, the statement says " * * * it was clear to Buck that the only choice for I–T–E was to return to pricing some sales of some equipment at book or to face a continuation of the then existing price war. * * *"

It would seem apparent that this is not an unintentional device to hide behind generalities. For it can be contrasted with the I–T–E's treatment, in paragraphs 60 through 64, of prices for low voltage ("large") power circuit breakers sold as components to switchboard assemblers. With considered detail, the statement recounts GE's "lengthy" efforts to get I–T–E to raise its prices to assemblers, I–T–E's refusal to do so, GE's "retaliation" in lowering all low voltage power circuit breaker prices and I–T–E's further reduction in price to retain the existing differential.

I–T–E also fails to explain how it retained its "independence" in this area, whereas, presumably, it was unable to do so with respect to other equipment.

3. A further illustration in the statement of really a combination of faults (e. g., too much generalizing, failure to refer to specific equipment, failure to state what I–T–E in fact did after "threats" or "meetings"), is the general impression that GE was *always* threatening I–T–E about "non-uniform" or "low" prices from 1930 almost to date—thus implying that I–T–E never did anything in response to GE's threats and thus establishing that there was no coercion.

However, although I–T–E fails to state explicitly what it did as a result of agreements with competitors, it is clear that I–T–E did something. Thus, the last sentence of paragraph 69 states:

"I–T–E deviated from price levels discussed at meetings and quoted lower levels whenever it felt it could get away with it."

4. I–T–E's indelicate balancing act (between the line of "not admitting" that there was a conspiracy and "establishing" that it was coerced into conspir-

ing) is shown by contrasting the above quotation with one from paragraph 67:

"Notwithstanding discussions among competitors at the Traymore meeting * * * and at other meetings, I–T–E personnel were instructed to run I–T–E's business their own way."

5. In short, virtually every single paragraph of the statement could be cited to show how I–T–E has failed to comply with Local Pretrial Order No. 4. Generally speaking, that failure is due to an attempt to avoid stating what I–T–E did in response to conspirators' "threats" (or suggestions), while, at the same time, to cite as many generalities as possible to establish that I–T–E had no choice but to do what GE told it to do.

6. In many instances, it is clear that the excuses offered by I–T–E could not possibly justify its approach to this statement, for the information of what I–T–E in fact did was obtainable from the same source which furnished the information as to what I–T–E was told to do. This is particularly the case with respect to information furnished by Scott and Buck.

7. Further, no circumstances advanced by I–T–E justifies some of the more obvious failures to comply with Local Pretrial Order No. 4. For example, under various subparagraphs of Paragraph 3 of the Order, I–T–E should have described fully the contents of various documents relied upon. But there are no such descriptions with respect to the bulk of the documents listed at pages 66 and 67 of the statement and that could have been done easily either narratively or by attaching copies. While it would be an extensive undertaking to set forth the contents, for example, of the various annual reports referred to, there is no excuse for not complying with the Order with respect to the documents nos. 1, 2, 6, 7, 8, 13, 14, 15 and 17.

8. I–T–E's list of excuses (pages 71–73) contains some very apparent weaknesses. For example, one excuse is that the major defendants refused to sell I–T–E copies of defendants' national depositions. They are, of course, available from the reporters. (Presumably, this refusal stems from I–T–E's refusal to share expenses when the defendants' program was undertaken.) Another example, is I–T–E's statement that it "has seen" only documents deposited by Chicago plaintiffs in the New York depository. Its failure to look at others is of its own doing.